# CHARLESTON.

### J. J. Ross *et als. v.* A. C. McConnaughy *et al.*

Submitted November 11, 1919.   Decided November 25, 1919.

1.  APPEAL AND ERROR—*Decree on Conflicting and Unsatisfactory Depositions—Reversal.*

    If a decree is based upon depositions which are so conflicting and of such doubtful and unsatisfactory character that different minds and different judges might reasonably reach different conclusions as to what the real facts deducible from them are, an appellate court will not reverse it, though such court might have rendered a different decree had it acted in the cause in the first instance.   (p. 200).

2.  AFFIRMANCE ON CONFLICTING TESTIMONY.

    A case in which the principles above noted are applied in the affirmance of a decree based upon conflicting testimony. (p. 209).

Appeal from Circuit Court, Logan County.

Suit by J. J. Ross and others against A. C. McConnaughy and others.   Decree for plaintiffs, and defendant A. C. McConnaughy appeals.

*Affirmed.*

*Greene & Hogsett* and *John J. Coniff,* for appellant.
*Fitzpatrick, Campbell, Brown & Davis,* for appellees.

LYNCH, JUDGE:

The object of this suit was the procurement of a decree de-

claring the four plaintiffs, J. J. Ross, Naaman Jackson, S. B. Robertson and Earl McConnaughy, to be interested jointly and equally with A. C. McConnaughy in an option dated December 30, 1913, granting to the latter the right of election to accept from H. C. Jones, the optionor, within fifteen days a lease similar in form and substance to the unexecuted lease attached to the option for the mining and removal of coal from the land of Jones and others associated with him in ownership, which option A. C. McConnaughy accepted by letter January 13, 1914, and later modified by a contract of March 16, 1914; and in the leases thereafter executed by Jones to McConnaughy and his assignee pursuant to said contract, one on December 16, 1914, the other on January 22, 1915; and requiring him to account to the plaintiffs for the profits derived from mining operations conducted by Maher-Pursglove Mining Company, a corporation, which entered into a contract with him for that purpose; and for a reference to a commissioner to ascertain, state and report an account of the rents, royalties and profits derived from such operation as the basis of a final decree in the cause. The decree brought here by McConnaughy for review upon appeal granted the relief sought by plaintiffs.

The theory of the bill is that, although all the contracts pertaining to the property were taken in the name of McConnaughy, it was done with the knowledge and acquiescence of the plaintiffs, with the understanding and intention on his part and theirs that he was to act in the capacity of a trustee in association with them and himself for their joint and equal benefit, advantage and profit. This arrangement, scheme and purpose he unequivocally denies in his answer, and endeavors to support his denial by his own testimony and that of others as witnesses on his behalf. The issue thus presented apparently is one of fact rather than of law. Obviously and naturally the proof offered to sustain these adverse contentions is equally variant, incongruous and hostile, as well as voluminous. This is true to such an extent that to undertake to give anything like an intelligible and comprehensive analysis of the testimony would extend the discussion beyond reasonable bounds and accomplish no useful purpose. We, therefore, find it necessary to detail only so much

thereof as in our judgment will render sufficiently obvious the ground upon which the result of this investigation is founded.

Plaintiffs Ross, Jackson and Robertson swear somewhat directly, positively and unequivocally in support of the allegations of the bill to the effect that before entering into the modified contract of March 16, 1914, the clear and explicit understanding between them and McConnaughy was as alleged by them, namely, that they, together with Earl McConnaughy, brother of appellant and also a plaintiff, who was not examined as a witness, were to be considered and treated as joint and equal partners with A. C. McConnaughy, and as such entitled to equal ownership with him in the subject matter of the contract entered into with Jones and those associated in title with the latter, and in the leases executed pursuant to such contract, including the Maher-Pursglove Company operating agreement based upon a tonnage royalty upon the coal mined and removed from the leased premises, and to the benefit of a ratable share in the profits derived from such operations, and that the use of A. C. McConnaughy's name alone was a mere matter of convenience.  Both Ross and Shrewsbury, the latter the draftsman and attorney who prepared the March 16, 1914, contract, both of whom were present together with A. C. McConnaughy, agree substantially in swearing in effect that their understanding at that time and on that occasion was precisely what Ross and co-plaintiffs say in their bill it was intended to be, and that McConnaughy communicated to them his concurrence therein.  As Ross states in substance, and Shrewsbury corroborates him, when the latter was about to begin the preparation of the contract, he inquired whom he should name as the other contracting parties besides Jones and those associated with him in the ownership of the premises that it was proposed to lease, and·Ross suggested himself, Robertson, Jackson and A. C. McConnaughy, or the latter as trustee, when A. C. McConnaughy interrupted with the suggestion to permit the contract to be drawn in his name alone without affixing the word "trustee", to avoid inquiry by Jones as to the other parties concerned.  This suggestion seems to have met with favor by those present, though McConnaughy denies that any such conversation was had, and as a counter proposition Ross advocated the contemporaneous preparation and execution

of a declaration of trust showing the names of the persons for whose benefit the paper in the course of preparation was intended. This declaration Shrewsbury prepared and delivered to Ross and he to McConnaughy, but it was not signed by any one, and McConnaughy says he heard no part of the conversation concerning the declaration of trust, did not consent to it, and that none of the persons except Jones and himself had any interest whatsoever in the transaction from its inception to the culmination of the deal with Maher-Pursglove Mining Company.

As confirmatory of the unity of interests beginning with the negotiations leading up to and culminating in the contract of March 16, 1914, and continuing thereafter till the execution of the leases of the following December and January, Ross testifies in substance and effect as follows: As an experienced and practical coal mining operator he and A. C. McConnaughy went upon the Jones property once or twice during the summer of 1914 and carefully examined it with the view of effecting a fair partition of the land between Jones and his cotenants, Litz, Anderson and Hughes, a division Jones bound himself in the contract of March 16, 1914, to procure, in order that a lease could be executed for the operation of the property. Also as indicative of the common right to share in the adventure, profit and responsibility of the joint enterprise, Ross assisted McConnaughy in procuring a $6,000 loan from the First National Bank of Logan, of which Jackson then was and still is cashier, the proceeds of which loan were deposited to the joint credit of Ross and McConnaughy, and paid to Jones upon their joint check drawn by McConnaughy alone in the presence of Ross, which on its face shows that it was "for cash payment provided upon contract dated March 16th, on Main Island Creek properties," the land that Jones proposed to lease being situated upon the waters of that stream. This note McConnaughy paid, as he claims and plaintiffs admit; but they say that in paying it he used either the funds jointly owned and controlled by both or the bonus collected from the Maher-Pursglove Company under the operating agreement upon a royalty basis which he apparently had executed for his exclusive benefit. In addition Ross rendered further assistance not only by means of his personal

influence with the officials of the bank and by his credit, but by pledging valuable corporate stock owned by him as security for the payment of the note, without which influence and collateral the proof leaves it doubtful whether the necessary loan could have been secured. Of this transaction Ross swears: "It was distinctly understood before we made the loan and I assumed that obligation in the First National Bank that all parties, that we, S. B. Robertson, Naaman Jackson, Earl McConnaughy and myself, were interested in the property, and it was through this understanding that I assumed this obligation and secured the loan." He further explains the loan as being necessary to relieve Jones from serious financial embarrassment and to enable him to save his property from an impending sale under a court decree to subject his property to the payment of claims against him, including the tract of 288 acres, part of the land leased by Jones, that being a condition admitted by A. C. McConnaughy, Jones and plaintiffs to have existed at that time. But Ross also swears that one of the purposes was to secure from Jones a new contract based upon the option of December 30, 1913, but containing terms more favorable than those specified therein, pursuant to which modified contract the leases of December 16, 1914, and January 22, 1915, were made by Jones, and with reference to which Ross says he and the defendant, A. C. McConnaughy, consulted. This consultation the latter unequivocally denied, as he also did the testimony of every other witness examined for plaintiffs touching the connection of the latter with these contracts.

However, Shrewsbury to the extent already noted, and Jones, Jackson, Robertson and T. W. Pursglove of Maher-Pursglove Company corroborate Ross as to many of the facts and circumstances of which he swears, though they seem not to have been interrogated respecting some of them. To be more explicit, Jones swore that he ascertained from A. C. McConnaughy himself that Ross, Jackson, Robertson and Earl McConnaughy were interested jointly and equally with him in the March 16th contract and the leases just mentioned, and as Jones further swears such was the understanding before any formal contract was entered into in regard to the property, and that A. C. McConnaughy contemplated the organization of a corporation in which

the plaintiffs were to own stock. Pursglove testified more particularly respecting A. C. McConnaughy's recognition of his brother's right to a like participation in the joint enterprise, and that it was through the latter that his company became interested in subleasing the property. Ross, Jackson and Robertson agree in their testimony to the effect that they and A. C. McConnaughy were interested together in a lease on land known as the Island Creek Coal Land Company, but finding it unsatisfactory after testing it by a core drill, the costs of which they jointly paid, they agreed to abandon it for the Jones property, and did so, and afterwards procured the contracts referred to by them.

What has been said indicates with sufficient precision to show the basis which, it seems to us, is amply sufficient to warrant affirmance, unless the proof to the contrary so effectually preponderates as to compel a reversal of the decree, according to the well established rule where the proof is conflicting. For if a decree is based upon depositions which are so conflicting and of such doubtful and unsatisfactory character that different minds and different judges might reasonably reach different conclusions as to what the real facts deducible from them are, an appellate court will not reverse it, though such court might have rendered a different decree had it acted in the cause in the first instance. 1 Michie, Enc. Dig., 620, and cases cited.

The defensive testimony differs in every material aspect from that introduced by appellees. Every statement made by them A. C. McConnaughy unequivocally denies and contradicts. Therefore, if what he says is true, and he testifies with apparent frankness respecting such matters, the decree cannot be sustained and must be reversed and the bill dismissed. This much we say in general terms. Speaking more particularly with reference to the right of the plaintiffs to participate with him in the emoluments of the Jones contract and consequently in the operating agreement with the Maher-Pursglove Mining Company, he said such right on their part depended altogether upon their agreement to negotiate a loan to finance a corporation thereafter to be organized, as required by the contract of March 16, 1914, of which each was to hold one-fifth of the stock, and that as they had failed to comply with the prescribed condition,

that agreement ceased to be operative and effective and became a nullity; and that it was because of such failure that he was compelled to enter into other negotiations to sublease the property which resulted in the leases of December and January with the Maher-Pursglove Company. That contention might have weight and influence in determining the merits of the controversy, were it not for other facts and circumstances disclosed by the proof which furnish substantial support for the decree complained of.

In other words, plaintiffs repudiate these preclusive conditional limitations upon their right to share in the benefits and responsibilities of the Jones contracts and the subsequent dealings therewith by McConnaughy. They were to negotiate a loan the proceeds of which were to be used for the purpose of organizing a corporation with capital stock of $50,000, which the agreement of March 16, 1914, required them to organize, and with those funds to pay Jones in cash the consideration named in the contract, or its equivalent in stock in the contemplated corporation when organized, as he might elect, less the $6,000 paid as a loan to him, the receipt of which the contract acknowledged; the balance remaining to be devoted to operating the leased premises. This loan, according to the testimony of Robertson and Jackson, was not to exceed $30,000, while McConnaughy fixes it at $50,000. Whatever the amount, the purpose for which it was to be used, as all the parties to the controversy agree, was to pay Jones and exploit the premises for the mutual profit of the incorporators. Early in April, 1914, Robertson and Jackson went to Cincinnati in an attempt to negotiate such a loan, but because of the financial stringency then prevailing failed in the attempt. But they and the other plaintiffs say their interest in the lease contracts did not depend upon their success or failure to obtain the loan, in which respect other testimony tends to corroborate them. According to the testimony of A. C. McConnaughy, however, Robertson and Jackson manifested no anxiety or interest in the success or failure of the enterprise after the abortive attempt to secure the loan. To use his language, they dropped out of it.

But there is testimony tending to support plaintiffs' contention that even after the failure of the attempt made in April

to negotiate the loan, the parties continued to act upon the basis of unity of interest. Under the contract of March 16, 1914, Jones was required to secure partition of his interest in the tract from those of his co-owners before executing the coal mining lease to McConnaughy, and until that was effected and the title thus cleared, no mining operations or development could safely be prosecuted, and for that reason, according to plaintiffs' testimony, they did not make greater haste in securing the funds for the organization of the corporation. McConnaughy replies by saying that after that failure plaintiffs took no further steps in the matter, and that in order to protect himself under the contract, since it seemed impossible to secure funds with which to organize the corporation required by its terms, he began to seek parties to whom he could sublease the property. But Ross, to show that the interest of the plaintiffs still continued, testifies that he went on the land in company with A. C. McConnaughy and Earl McConnaughy in June, 1914, with the idea of making preliminary plans for developing the property after the partition should be made and the lease executed, and again in September of that year he accompanied the two McConnaughy's, R. R. Smith and H. C. Jones and "spent a day on the property discussing it and making such suggestions as I felt would assist and aid in reaching an agreement governing a partition of the property." (Rec. 114). The partition was finally effected in October of that year. Ross further testifies that after the failure to secure funds in April for the organization of the corporation, A. C. McConnaughy frequently consulted him with reference to the property respecting the advisability of subleasing it, and more particularly he discussed with McConnaughy the negotiations conducted by the latter with the Maher-Pursglove Company, advocated the acceptance of two cents per ton royalty rather than a one-fifth interest in the stock of the latter company, and permitted McConnaughy to use the books and cost statements of the Logan Mining Company, of which he was an officer and McConnaughy its chief clerk, in order to get data with which to convince representatives of the Maher-Pursglove Company of the profits that existed in the mining industry in that field. All these things A. C. McConnaughy denies (Rec. 244 et seq.) or explains in such a manner as to rebut the in-

ference of continuity of interest among plaintiffs and himself after the efforts of the former to secure funds had failed.

There seems to be but little doubt that a trust relation of some character existed at least for a short while after the execution of the contract of March 16, 1914. The testimony of A. C. McConnaughy on cross-examination (Rec. 290) indicates that. He was asked: "Let us suppose that Judge Wilkinson had come along on the morning of March 17th, and had offered you $50,000 for an assignment of the contract with Jones, what would you have done with this sum of $50,000; would you have kept it or divided it with the four"? His answer was: "I could not have accepted the $50,000 according to my contract; according to my contract I would have had to divide up because they had not made any default up to that time"; apparently referring to the failure to negotiate the loan which they undertook to secure.

Letters written by appellant to his brother Earl shortly after the execution of the contract of March 16th contain further admissions concerning the relations then existing among the parties. In a letter of March 31st (Rec. 352) he says: "I guess I old you I will split the balance of the stock between the five of s, after Doc (Dr. H. C. Jones, the lessor) gets his. You can onsider yourself lucky indeed to drop into a proposition like this at the start." And in one dated April 4th (Rec. 346) he says: "I wrote you the stock would be divided among the five of us; (that) is, the stock that is left after Doc Jones takes his. He may take his $16,666.66, and may not. Ross and I borrowed $6,000 and gave personal endorsement and paid him (Jones) as part payment on the bonus. He may not have this when lease is closed to pay back. I really am giving too much away for the work I have done and the money spent. So far as the salary is concerned, that surely is a small consideration when you consider the interest you get for nothing."

But appellant insists that, whatever may have been the relations of the parties prior to the failure of the plaintiffs during the early part of April to obtain the money necessary to organize the corporation which the contract of March 16th required them to organize, they did nothing further thereafter respecting the property, but dropped out altogether leaving him to dispose

of the contract as best he could, and that any agreement to share equally with them was contingent upon their doing what they had undertaken, and, failing in that, the agreement was at an end. There is testimony to show that plaintiffs did little, if anything, after their failure to obtain the loan. Ross, however, as we have noted, testified that he advised with McConnaughy throughout all the period intervening between the contract of March 16th and the leases with the Maher-Pursglove Mining Company in December, 1914, and January, 1915; but these statements appellant flatly denies and contradicts.

In a letter to his brother Earl October 11, 1914, (Rec. 339), appellant uses language which seems to indicate that Ross still was interested in the property. He says: "Pursglove does not seem to like Ross. Since they left I was told they would not go into anything Ross was in, and Tom's (Pursglove) brother asked me if I could get Ross out. Tom said he knew you better than me and he would tell you and you could write me, and said I would be surprised. * * * I feel someone in the field that does not like Ross has found out that Ross has not been treating me right on the proposition and told them about it, or it may be that Ross has been talking about me some to the business men since we had our disagreement. * * * I would like to work it out so nobody but themselves, you and I and Doc (Jones) would be interested, except I would like to let Flynn and Simms put in $1,000 each if they can raise the money."

Again on October 30th (Rec. 343) he wrote: "Sam, Dave, Tom and Mr. Maher were here; leave this P. M. at 4 o'clock. * * * They talked about raising $35,000 last night, but said they thought we ought to raise $50,000 today. I told them they could (raise) $30,000 and us $20,000. They have no objection to Ross coming in. I know that Ross did not do what he has been accused of. * * * I think Ross will come in and that he may help you out"; meaning to assist Earl financially.

And on November 11th (Rec. 344) he wrote: "We are trying to work out a proposition in connection with the Buskirk tract and the 105-acre tract and keep the coal on the Main Creek (that involved in this litigation) to operate ourselves, and in this way I can take care of you, Ross and etc., but we do not know whether anything can be done. They (Maher-Pursglove

Company)' have agreed to furnish the money, $30,000, themselves, and give Doc and I 1/5 interest each, but of course that will not take care of you." I will try and work it out so we will have a tract to operate ourselves."

Enough of a resume of the evidence has been given to show clearly that some kind of a trust arrangement was entered into at the time of the contract of March 16, 1914. But it is conflicting as to whether that relationship continued down through the leases of December and January, or terminated when plaintiffs failed to procure the funds in April, 1914, for organization purposes. In view of this conflict, and in the absence of a clear preponderance in support of appellant's contention and against the finding of the court below, we are disposed not to disturb that finding. Our order, therefore, will affirm the decree of the circuit court of Logan County.

*Affirmed.*