# CHARLESTON.

## TONY WEGMANN *v.* J. P. CLARK.

Submitted May 8, 1923.    Decided June 26, 1923.

1. SPECIFIC PERFORMANCE—*Agreement for Oral Lease of Land Must be Certain and Definite; Acts Proved in Part Performance of Oral Lease of Land Must Refer to. Result From, or oe Made in Pursuance of Agreement Proved; Agreement for Oral Lease of Land Must be so far Executed that Refusal of Full Execution Would Operate as Fraud.*

    In a suit for specific performance of an oral lease of real

estate for a term of years, it must appear that there was an agreement which was certain and definite in its terms; that the acts proved as made in part performance must refer to, result from, or be made in pursuance of the agreement proved; and that the agreement must have been so far executed that a refusal of full execution would operate a fraud upon the party, and place him in a situation which does not lie in compensation. Without a concurrence of these three things, specific execution will not be enforced.  (p. 375).

2. APPEAL AND ERROR—SPECIFIC PERFORMANCE—*Decree Refusing Specific Performance of Oral Renewal of Lease, Where Evidence as to Existence of Contract or its Terms Conflicting Not Disturbed.*

Where the evidence of the renewal of a lease of real estate for a term of years relied upon is oral and there is a conflict therein which renders it doubtful if there ever was such a contract, or that it was uncertain and indefinite in its terms, and the lower court on such evidence has refused to decree a specific execution therof, this court will not disturb the decree, much weight being given to a finding of fact by the lower tribunal.  (p. 374).

Appeal from Circuit Court, Kanawha County.

Suit by Tony Wegmann against J. P. Clark.   From a decree for defendant, plaintiff appeals.

*Affirmed.*

*Morgan Owen* and *E. B. Dyer,* for appellant.

*Horan & Pettigrew,* for appellee.

MILLER, PRESIDENT:

The bill is for specific execution of an alleged oral contract between plaintiff and defendant to extend or renew a lease for a room at 26 Summers Street, in the city of Charleston.

At the time of the alleged contract plaintiff was in the occupancy of the room under a written lease, dated January 1, 1918, calling for a term of four years, at the stipulated monthly rental of seventy-five dollars per month in advance.

The bill alleges that on the making of the original lease plaintiff took possession of the premises and installed therein a meat market; that about July, 1920, when considering and before the installation of a refrigerating plant, at a cost of about $4,000.00, which had to be especially made and fitted

to said store room, if so installed, he decided that unless he could get a renewal of said lease, he would not undertake to install such a plant therein, and that before undertaking to do so he called upon the defendant and advised him of his intention and the conditions thereof and proposed that if defendant would grant him a renewal of the lease he would undertake the improvement; that to this proposition defendant replied that he would make him a new lease for a rental of $125.00 per month, to which he answered that he could not install the refrigerating plant and pay such increased rental, and would not do so, but would wait until his lease expired and get other quarters; that thereupon defendant said he was going to Florida, to be gone for some time, but that plaintiff should go ahead, install his plant, and that on his return from Florida, which would be some time in April or May, 1921, defendant would renew said lease and treat plaintiff fairly.

It is further alleged that, relying on the promise of defendant, plaintiff did purchase and install said plant in said store room, at a cost of about $4,200.00, which consisted of large tanks, boilers, engines, pipes, etc., weighing many thousand pounds, attached to the freehold by large steel bolts and other appliances and fixtures, specially made and fitted to said premises, and which had been and still was in daily use by plaintiff in his business.

It is further alleged that upon defendant's return from Florida, in April or May, 1921, plaintiff called upon him to renew his lease; that thereafter, on or about August 1st, defendant presented him with a newly drawn lease, dated on that day, running for a period of two and a half years from August 1, 1921, at a monthly rate of $225.00, with various other stipulations and agreements therein not included in the said original lease, which was filed with the bill and made a part thereof, and which the bill alleges plaintiff refused to accept or execute.

It is further alleged that plaintiff had complied with his part of the old contract and with his part of the contract with defendant for a renewal thereof, but that defendant had declined and refused to execute a renewal of said old lease; that

he has always been ready and willing to accept and execute a renewal lease and to comply with all the terms and conditions thereof.

The bill further alleges that in January, 1922, the defendant instituted before one Acre, a justice of the peace, a suit of unlawful entry and detainer against plaintiff to secure the possession of said store room, which was heard and judgment was given against plaintiff for the possession of said store room and $300.00 damages, that is damages at the rate of $300.00 per month; that plaintiff appealed from the judgment of the justice to the Intermediate Court of Kanawha County, which said cause is now pending, and was set for trial therein on May 3, 1922.

Wherefore the prayer of the bill was that defendant be required to specifically execute and deliver to plaintiff a proper renewal of said original lease for the period of four years, from January 1, 1922, to January 1, 1926, and that in the meantime defendant, his agents, employees and attorneys be inhibited from the further prosecution of said unlawful detainer suit, and for general relief.

Defendant's demurrer to the bill was overruled and he answered, not denying but admitting the facts alleged regarding the original leasing and occupancy of said store room by plaintiff, but denying the allegation of the bill that before installing his refrigerating plant therein plaintiff had decided that unless he could get a renewal of his lease he would not so install the same; he admits that in June, 1920, he did offer to execute a lease to plaintiff for said property for a term extending five years beyond his then lease, about one and a half years, at a rental of $125.00 per month from June 20, 1920, but that plaintiff then declined the proposition and declared that he would await the expiration of his old lease, as he thought the rent would then be lower, and that respondent advised him that whatever the rental value might then be he would have to pay. And the answer further denies that there was any understanding whatever between plaintiff and defendant as to the installation of said refrigerating plant, or that plaintiff then stated he could not afford to install said plant and pay the increased rental, and that

he would wait until his original lease expired and then get new quarters; that it was not true that respondent then stated to plaintiff he was going to Florida to be gone for some time and advised him to go ahead and install said refrigerating plant and that upon his return which would be some time in April or May, 1921, he would renew said lease and treat plaintiff fairly. The answer further alleges that respondent did not go to Florida until some time in December, 1920; that he was not advised by plaintiff as to what said refrigerating plant would cost, and that he had nothing whatever to do with the installation thereof; and that he did not propose to lease or renew said lease for said premises except as therein alleged.

The answer admits that respondent returned from Florida in June, 1921, and that plaintiff then again took up with him the subject of a new lease on the property, which was discussed during June and July, and that finally an agree-. ment was reached whereby respondent was to execute a new lease to begin August 1, 1921, for a term of two and a half years, at a monthly rate of $225.00, defendant at the same time offering to extend it for five years, which plaintiff declined, saying that he did not desire it for more than two and a half years; that pursuant to said agreement respondent did have prepared a new lease in writing, in conformity with said agreement, and at the instance of plaintiff inserted therein as co-lessee the name of his wife, and presented the same to plaintiff, which he afterwards declined and refused to execute, giving as his reason therefor that the rent was too high and that he was going into the wholesale meat business and intended to move to other quarters at the expiration of his old lease, on December 31, 1921; and that plaintiff had no lease other than the one which expired on that day.

To establish the fact of the alleged agreement of the defendant to renew the lease, plaintiff relied mainly on his own evidence and that of his son, who he claimed was present when the alleged agreement to renew was made. Plaintiff himself swore that if he was not mistaken, it was in May, 1920, in the back room of his present store room, back of the ice box, to which place plaintiff says he then invited

defendant; that defendant in the presence of the son said to him: "Tony, I give you a new lease; you start from today at $125.00 per month"; that plaintiff replied: "Mr. Clark, I can't do that. I can't afford it. I have to borrow money to put this plant in, and it will cost about $4,000.00." He further says: "Then we talked around, and he said when he left, he said he was going to Florida, and he would make it all right and would renew me the lease when he came back"; that defendant also said: "You go ahead and put in that plant, and I will renew the lease when I come back from Florida." He further testified that after this conversation he went on, and in November, 1920, he installed the plant, and that in July or August, 1921, after Clark had returned from Florida, he saw him and said to him: "Mr. Clark, what are you going to do about renewing my lease"; and that Mr. Clark replied: "All right, I make you the lease"; he said, "$250.00"; and that plaintiff replied: "I can't do that. You know what you promised me." He wouldn't do that. He said I ought to pay $300.00; that I made enough in the business when I was there. He further says that Clark sent a lease by a colored fellow, providing for a rental of $225.00 per month, which he declined, including in it the name of his wife as co-lessee, which he refused. Plaintiff admits that when first approached on the subject, in 1920, defendant first proposed to extend the lease, to begin then, at $125.00 per month, and that he declined the offer; and that he did not afterwards see Clark until he returned from Florida, in July or August, 1921; and when asked on cross-examination how he got it into his head, after he refused Clark's offer to renew or extend the old lease at $125.00 per month, that defendant was going to renew the lease at $75.00 per month, he answered: "That was what I figured, what he told me." Again he says: "That was the way I understood it; that he was to renew the lease for $75.00 per month." He admits that in August, 1921, after defendant had returned from Florida, that the subject of a new lease was taken up, and Clark first demanded $250.00 per month, but that he came down to $225.00, and such a lease was pre-

pared by a colored lawyer and offered him, but that it was declined.

Albert Wegmann, plaintiff's son, in corroboration of his father's story of the alleged agreement made near the ice box, says: "I was in the back room, back of the ice box. I was in there washing up some pans and things, and I noticed Mr. Clark and my father talking, and I heard my father ask him about putting an ice plant in the market, and wanted to know if he would renew the old lease. Well, Mr. Clark says: 'I will give you a new lease starting now for $125.00 a month for five years.' My father told him he couldn't pay that— he was going to a lot of expense to put in the ice plant, and had to borrow some money, and couldn't afford to pay $125.00, and if he had to do that he would move out into another building, and Mr. Clark says: 'All right, Tony, go ahead and put in your ice plant—I am going to Florida, and when I come back I will renew your lease and make it all right.' I had finished my work then and went out."

Notwithstanding the alleged agreement so testified to by plaintiff and his son, as having been made near the ice box, which plaintiff says, if he is not mistaken, took place in May, 1920, he admitted that some time prior thereto, some eight or ten days, he was in defendant's office in the same building, above plaintiff's store, in company with Frank Johnson, a colored barber occupying a room adjoining that occupied by plaintiff, both seeking renewals of their leases. Plaintiff admits the fact testified to by both Johnson and defendant, that Clark then proposed to renew his lease at the rate of $125.00 per month, to begin then and to run for the term of five years, but that plaintiff then declined the proposition. When asked on cross-examination why he had not testified to this conversation in his examination-in-chief on his own behalf, answered: "Well, they first asked me so many questions and that's what I answered. I didn't pay no attention to something else. I answered the questions they asked me."

The defendant himself denies the alleged conversation with plaintiff in May, 1920; he says he was in Florida in May of that year and up until he returned, which was about June 5th, and that it was not until June 15, 1920, that he had the

first conversation with plaintiff in the presence of Johnson
in defendant's office. He says that Johnson first told him
that plaintiff wanted to see him, and that he said, "All
right"; that Johnson with plaintiff came up to defendant's
office together; and as to what took place there, defendant
says: "Q. Was that up to your office. A. Yes, sir, up
stairs to my office. Tony asked me to extend the lease for
five years longer. It wasn't no five years; it was five years
in addition to what he had, and he had about eighteen months
at that time, maybe a little more or a little less. I said, 'All
right, Tony, I will do that. You pay me $125.00 beginning
now.' Tony said, 'Mr. Clark, that is too high. I have got
in the neighborhood of two years yet on my old lease and I
will wait.' I said, 'All right, Tony, you can wait.' He said
to me then, 'What will I do when my time is out.' I said,
'Tony, what anybody else pays you will pay. If it is $4.00
a month you will pay it; if it is $400.00 you will pay it.'
He said, 'All right, I will wait.' We all came down stairs
and that was the last of Tony Wegmann's and my conversa-
tion. Q. Did you ever have any conversation with him in
reference to the lease after that time? A. Not until 1921.
Q. State what conversation you had then. A. Tony Weg-
mann called me up to his office—not his office—his butcher
shop there. He said, 'I want to see you.' I said, 'All right,
Tony.' He said, 'Come on in.' I went in there. He said,
'How about a new lease?' I said, 'All right, Tony, I will
give you a new lease.' He said, 'What are you going to
charge me?' I said, '$250.00 a month.' He said, 'My God,
Mr. Clark, that is too much!' I said, 'I can get $250.00 a
month.' He says, 'I can't pay it.' I said, 'All right,' and
I walked out. I met him again, and he said, 'Come in and
let's talk this lease over.' We sat down in the window and
I talked to him. Finally he said, 'Let's split this.' I looked
at him for a long time; I said, 'I will tell you what I will do,
Tony. If you start this lease now, I will make it $225.00.'
He said 'All right'; he said, 'You get the lease up.'" I said,
'All right. How do you want this lease drawed?' He said,
'You draw that in my and my wife's name.' I said, 'What
is your wife's name?' And he told me what his wife's name

was, and I happened to meet Kimbrough out there and I had Kibrough to write that lease up; told him the details and all. Kimbrough wrote the lease up and fetched it around and Tony was in Cincinnati. I said, 'Where is Tony?' He said, 'In Cincinnati.' I said, Here is a lease for him. Give it to him when he comes back and let him read it.' To the best of my knowledge in about a week I went around there and Tony was at the door. I said, 'Tony, did you get the lease?' 'Yes.' 'How do you like it?' He said, 'I don't like it.' I said, 'What is the matter with it, Tony?' He sat down in the window. The words he used—'What in the hell is my wife's name doing in there?' I said, 'Nothing as I know of. You told me to put it there.' He didn't say a word about that after that. He said, 'Look at that marble and glass in there.' I said, 'Tony, ain't that in your old lease?' He said, 'No, sir-ee, it is not.' I said, 'If it ain't you shall have this house at a hundred dollars a month.' He ran right to his place and ran out. I said, 'Don't that say on the bottom I can move that any time I want to.' He used these very words. 'How in the hell did that get in there?' I said, 'Now Tony, you don't want this?' He said, 'No, I don't. My lawyer told me not to sign that contract.' I said, 'All right, Tony, there is no harm done. I walked out and left him. Otherwise he said his lawyer told him not to sign it and he could save him $125.00 a month—he had that into it. His time was out. * * * Q. Well did he accept that proposition? A. No, sir, he refused. Q. He testified, as I recall, that you agreed with him in 1920 that when you returned you would give him a new lease or renew the old one at $75.00 per month? A. No, sir, I never made no such agreement with him nor nobody else. * * * Q. Did you ever have any conversation with him concerning the leasing of this property other than in 1920, the one that you speak about when Johnson was present, and the other time in July, 1921? A. Not to my knowledge. * * * Q. Did you ever promise Tony Wegmann in 1920 or at at any other time to make him a lease or to renew any lease other than the lease you speak of at $125.00 per month, beginning at that time, and the $225.00 as shown in the written paper that was to be signed? A. No, sir, never promised him anything.''

Kimbrough, the lawyer who prepared the lease of August 5, 1921, and presented it to plaintiff for execution, says, that when he presented it to Wegmann, Wegmann said, "What did you put my wife's name in that lease for? She hasn't got anything to do with my business; I run my business myself; my wife hasn't got anything to do with it; I don't want her name in there." And this, the witness says, was about the sum and substance of his objection. Kimbrough says that he replied that he "didn't know anything about it"; that Mr. Clark told him to put her name in there, and that was all he knew about it. And the witness was asked: "Did he raise any objection to the lease other than in respect to putting his wife's name in the lease? If so, what?" Answer: "No, sir, he never said anything else about it. That's the only thing he seemed to have been—he seemed to have objected to, the name of his wife in there, and he wanted that out."

On cross-examination of his testimony in chief, referring to the attempt to get a renewal lease in July, 1921, plaintiff testified as follows: "Q. If he said he was going to renew it, for what length of time was he to renew it? A. For four years, that was what I was figuring on. Q. What was the reason that you and Mr. Clark, in July, 1921, began to talk about a different rental if there had been no agreement to renew the old lease? A. He said he wanted $250.00. Q. You asked him if he was going to renew it, he said yes, sir, $250.00? A. That is what he said. Q. Did you agree upon any amount? A. No, sir. He came to $225.00. I said you go and make the lease out like you promised me. He did make the lease and sent it by a colored fellow. Q. In the first place, in July when you asked him to renew it he wanted $250.00 a month, and you were unwilling to pay the $250.00; then he wanted to reduce it from $250.00 to $225.00, and he was to go off and have the lease written up and bring it back, and he did bring back a written lease, and that lease had you wife's name in it? A. Yes, sir, it had my wife's name in it. Q. You didn't tell him before he brought the lease back that you didn't want your wife's name in it? A. No, sir, I didn't want my wife's name in the lease. Q. Well, he did then have the amount fixed in the lease at $225.00?

Yes, sir. Q. Well, when was the lease to commence for $225.00? A. Right away.''

The record shows that at the time defendant is alleged to have promised plaintiff to renew his lease rates had advanced greatly, and that they had continued to advance up to the time the lease was prepared in August, 1921; that at that time Johnson, the colored barber, was paying for the adjoining room and the barber shop fixtures, then owned by defendant, $50.00 per week, more than $200.00 per month, the room being not quite as large as the one occupied by plaintiff.

The plaintiff predicates his right to specific performance on the theory that he had a definite and complete contract for renewal at the rate of $75.00 per month, the rate specified in the old lease, whereby he was induced to expend money in installing his refrigerating plant; and that defendant had breached the contract and was about to cause him great loss, and in equity and good conscience entitling him to specific execution.

On the conflicting evidence detailed, the court below denied plaintiff the relief sought. The rule in such cases is that the appellate court, though it might have found otherwise, will not disturb the finding of the lower court where the evidence is such that different minds might reasonably disagree. *Vickers* v. *Vickers,* 89 W. Va. 236, 242, and cases cited. We think the evidence of plaintiff and his son leaves the question whether defendant agreed to renew the old lease at the same rate per month as the old very doubtful; indeed we do not think this evidence clearly sustains the allegations of the bill. It is quite significant that some ten days after the date of the alleged agreement in the presence of the witness Johnson, as the witnesses thereto agree, the defendant had positively declined to extend or renew the lease at less than $125.00 per month, and then only upon condition that the new rate should begin at once, and so soon afterwards, as plaintiff and his son say, in the back part of plaintiff's place of business, in the presence of plaintiff and his son alone, had so changed his mind as to have entered into the alleged agreement. Moreover, the plaintiff's testimony is not very definite as to the rate agreed. He uses

the language: "As I understood it." He might have mis-
understood the defendant, and evidently did. The facts and
circumstances attending the parties render the alleged agree-
ment quite doubtful. In the first place plaintiff still had
about a year and a half remaining of the term of his old ·
lease. Naturally he was loath to give up that part of the
term of the old lease at the low rate of rent for a renewal
or extension of the old at the higher rate. The difference
in rate for the unexpired term of the old amounted to nearly
a thousand dollars. Evidently he concluded to take the
chances of installing his refrigerating plant, for if he should
at the end of his then term be required to vacate the building,
he could do·so for the amount of the rent saved, and he had
the chance of a lower rate at the end of the old lease. Plaintiff
placed the time of the alleged agreement in May of 1920,
but says it was after the negotiations in defendant's office,
which defendant and Johnson say took place in June. De-
fendant proves he was in Florida in May of that year; if
so he could not have had the negotiations with plaintiff, as the
latter swears, in May.

· And it is not altogether probable that defendant in the
advanced market would have entered into such a contract
with plaintiff when Johnson, the adjoining tenant, was then
paying $35.00 per week, and later paid defendant $50.00 per
week for his room, there being included in his rent the use
of the old barber shop fixtures owned by defendant.

To justify the relief of specific performance of a parol
agreement relating to real estate, three things, as the books
say, must concur; first, the agreement relied on must be
certain and definite in its terms; second, the acts proved in
part performance must refer to, result from, or be made in
pursuance of the agreement proved; third, the agreement
must have been so far executed that a refusal of full execu-
tion would operate as a fraud upon the party, and place him
in a situation which does not lie in compensation. *Wright* v.
*Pucket,* 22 Gratt. 370; *Pierce's Heirs* v. *Catron's Heirs,* 23
Gratt, 588. As before indicated the agreement of renewal
sought to be specifically enforced, is uncertain, and in its

terms indefinite.    The fact that plaintiff installed the re-
frigerating plant while .defendant was in Florida connotes
with the view that there was some understanding that he,
plaintiff, would continue to occupy the premises.    That is
all quite true ; both parties contemplated it evidently.    One,
however, contends that it would be at the old rental of $75.00 ;
the other at an increased rental, governed by current rental
values.    The acts of part performance under an alleged verbal
contract must equivocally and in their own nature be refer-
able to some such agreement as that alleged ; in that event
they are admissible in evidence.    All that can be gathered
from acts of part performance is the existence of some under-
standing in pursuance of which they were done.    They are
admissible as evidence of a contract ; but what that contract
is must be shown from other evidence.    The acts of part per-
formance here will comport with the contentions of either
party.    Fry on Specific Performance. (5th ed.), Sec. 581.
On the conflict of oral testimony the lower court found that
he was not warranted in decreeing specific performance, and
under the well established rule we can not disturb that find-
ing, unless it is clearly erroneous.    *Ross* v. *McConnaughy*, 85
W. Va. 199 ; 1 Enc. Dig. Va. &    W. Va.    Rep.    620, and
citations.

We affirm the decree.

*Affirmed.*