# CHARLESTON.

H. H. PINKNEY *v.* SAMUEL DIXON *et al.*

(No. 5738)

Submitted April 12, 1927.    Decided April 19, 1927.

APPEAL AND ERROR—*Decree Denying Specific Performance of Oral Contract for Sale of Stock Uncertain in Terms, Based on Conflicting Oral Evidence, Will be Affirmed.*

   The decree of a circuit court denying specific performance of an alleged oral contract for the sale and purchase of stock in a corporation uncertain in its alleged terms, based on conflicting oral evidence, will not be disturbed, but affirmed on appeal to this court.

   (Appeal and Error, 4 C. J. § 2870.)

   (NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Appeal from Circuit Court, Raleigh County.

Suit by H. H. Pinkney against Samuel Dixon, individually and as president of the Price Hill Colliery Company, and others, for specific performance. From a judgment for defendants, plaintiff appeals.

*Affirmed.*

*File, Goldsmith & Scherer,* for appellant.

*Dillon & Mahan,* and *Price, Smith & Spilman,* for appellee Samuel Dixon.

MILLER, JUDGE:

The defendants, besides Samuel Dixon, in his own right and as president of the Price Hill Colliery company, are the Price Hill Colliery Company, a ·corporation, George H. Butman, secretary thereof, and Fred Dixon, Jr., the latter a son, and the plaintiff, H. H. Pinkney, a son-in-law of the said Samuel Dixon.

The defendant company since 1899 has been the owner in fee of 1159 acres of land situated in Fayette and Raleigh counties, this state, then well timbered and underlaid with valuable seams of coal, acquired from the said Samuel Dixon and associates, to whom in payment of the purchase price the company issued shares of its capital stock, and which company, August 1, 1905, leased said land with other lands to the Price Hill Fuel Company, for coal mining purposes, and for other purposes mentioned in the lease. Dixon was president of the lessee company and continued in said office until 1910 (the answer says 1912), engaged in opening and equipping the mine, and mining and shipping coal, expending, the bill alleges, approximately $200,000.00, when he was superseded by S. A. Scott, who operated the property under said lease until the year 1913, when the property was abandoned, the lease forfeited, and the equipment put upon the property by the said lessee was acquired by the lessor company, which began in 1917 to reopen the mines and operate the property through the management of Samuel Dixon, president, and other officers, directors and agents of the Price Hill Colliery

Company.   The work of reopening and rehabilitating the mines continued up to the spring of 1918, during which time considerable coal was mined and marketed, when plaintiff was employed by the said Samuel Dixon, president, on behalf of said company, as superintendent of operations and as mining engineer, and who continued therein on terms agreed until discharged therefrom by said Dixon, president, July 28, 1922.

The purpose of the present bill, brought January 29, 1923, was to enforce specific performance by the defendant Samuel Dixon of his alleged contract with plaintiff, made contemporaneously with the contract of employment by said company, July 18, 1918, whereby as a further inducement to him to accept that employment and assist Dixon in putting the property on its feet, the said Dixon, offered to sell to plaintiff one hundred (100) shares, part of the capital stock of the Price Hill Colliery Company owned and held by him in said company, at the price of one hundred dollars ($100.00) per share, to be paid for out of the earnings of said company, and when so paid for, the same to be transferred to plaintiff, and a certificate or certificates therefor issued to him.

The bill alleges, that induced by said offer of sale and purchase of said stock, plaintiff accepted said proposal and the employment of said company, upon the terms of $300.00 per month, and in addition thereto the use of a dwelling house for himself and family, and light and coal without charge therefor, and continued in the employ of said company, in the capacity aforesaid, and for the compensation aforesaid, from July 18, 1918, to July 28, 1922, on which latter date he was discharged by said Dixon for no other reason than that he insisted on performance by the latter of his alleged contract respecting said stock.

The bill further alleges part performance by said Dixon of his said contract with plaintiff, by physically delivering to him, in November 1919, Certificate No. 31, for 58½ shares of the capital stock of said colliery company, part of the 100 shares contracted for, and which was still held and owned by him, and that he was entitled to have the same transferred and a new certificate therefor issued to him by said company.

The defendant Dixon demurred to and answered the bill, denying by his answer every material allegation thereof, and with respect to the acquisition of and present possession of said Certificate No. 31, for 58½ shares, respondent answers that said certificate, which stood on the books of the company, not in respondent's name, but in the name of his son, Fred Dixon, Jr., and pledged to respondent by him as security for obligations owing him, was loaned to plaintiff to be pledged by him as collateral, first, on a note of $2,800.00, for money borrowed by plaintiff from the Merchants National Bank of Montgomery, and later on a note for $3,000.00 for money borrowed by him at the First National Bank of Mount Hope, and on the payment of said latter note, plaintiff had surreptitiously obtained possession of said certificate from an assistant in the bank, who was without knowledge of defendant's rights, and had thereby attempted to appropriate the same to his own use, and which certificate the answer, by way of cross-bill, prays the plaintiff may be required to surrender, or that the same be canceled on the books of the company and a new certificate issued to the owner thereof. A special replication denies the grounds alleged in the answer, for such affirmative relief.

On the issues joined on these pleadings much oral and documentary evidence in the form of depositions was taken on behalf of the principal parties to the suit, which on being considered, the lower court was of opinion, and by the decree appealed from found as a fact that the plaintiff had not sustained the allegations of his bill that he was to have as a part of the consideration of his employment by the defendant, Price Hill Colliery Company, one hundred shares of the capital stock of said company owned by the defendant Samuel Dixon, and further that he was not entitled to specific performance of his alleged contract; wherefore, it was further adjudged, ordered and decreed that he take nothing by his bill, and that the same be dismissed with costs; and further that the said Certificate of Stock No. 31 for 58½ shares of the capital stock of the Price Hill Colliery Company, which the court found was loaned to plaintiff as alleged by Dixon, should be

returned to him by plaintiff within thirty days, or upon his failure to do so, the same was thereby canceled, and that the board of directors should issue to the said Fred Dixon, Jr., or his order a new certificate.

To sustain plaintiff's contention that he had purchased the 100 shares of stock of the defendant Dixon as claimed, and to give color to his theories, he introduced much evidence to show the facts and circumstances of his prior connection in the same capacity with the mining operations of the Price Hill Fuel Company when operating said property under the lease of 1905; also his residence and employment in a similar capacity in the state of Montana just before he was employed by Dixon in the spring of 1918, on the occasion of his visit to Dixon's home in West Virginia, and when he says he was induced to resign his Montana position and return to West Virginia with his family and accept employment with the defendant company on the terms alleged in his bill; also certain alleged admissions by Dixon to plaintiff, his wife, her infant children, and two or three other witnesses, all denied by Dixon, that he had given or agreed to give Pinkney 100 shares of his stock in said company as an inducement to him to accept said employment; also on the fact that plaintiff had at the same time offers from two other coal companies, of similar employment on better terms as to salary, notably by the Richlands Coal Corporation; also on the value of his services as an organizer of the business and as a mining engineer, and his familiarity with the mines because of his former connection with them. But plaintiff relied mainly on a letter from Dixon, of June 30, 1918. Prior to that letter Dixon and Pinkney, as the correspondence and other evidence shows, had been considering and preparing for the purchase and joint operation of coal properties in Virginia, near Richmond, and near to where Dixon lived on a farm, one known as Gayton, which they hoped to acquire and to operate with others as soon as Dixon should get the Price Hill property going satisfactorily. Pinkney had gone so far in anticipation of the Virginia property as to deposit $3,000.00 in a bank, to make up with Dixon $10,000.00 of the money required by the owner of the prop-

erty, so that Pinkney's coming East was with special reference to the Virginia rather than the Price Hill operation, and in connection with which Dixon's stock in the Price Hill Colliery Company was not considered. The letter of June 30th, after making reference to Gayton and other propositions, and expressing doubt as to the success of Gayton for lack of ability of associates to raise their proportion of the necessary funds, said of the Price Hill property: ''About Price Hill Miller is I am afraid too old to get around and has absolutely no following nor has he any magnetism, or tact any more to keep men. In consequence, we are short of men and we are not getting along as we should do. No progress has been made since you were here worth speaking of. I pay him $2400, but would do better and make it a Dividend Dividing proposition if we conclude you should come here—You being here would relieve me & would while I was here give me a place to stay. Hence maybe there are several reasons why you could help put this on its feet and let us sell out & go elsewhere. Then probably you could do your own Engineering which would make it better anyway think it over by the time I come home and we can talk it out.'' Signed, ''Yours, S. Dixon.'' There is nothing in this letter to indicate that by suggesting a ''dividend dividing proposition'' Dixon was proposing a personal obligation with respect to that element of the contract, than with respect to the monthly salary, house rent, fuel supply, light, etc. No one pretends that these latter items were to be supplied by Dixon personally; and it seems to us quite unreasonable to assume that Dixon was preparing to give away for the benefit of the entire company so large a part of his own stock holdings, only one-fourth of the outstanding stock, and not impose that burden on all the stock. There is nothing suggested in the letter that could not be as readily complied with by the sale to Pinkney of 100 shares of treasury stock, or the issue of additional shares to be paid out of the profits or dividends declared, and the burden thus equalized upon the entire property. This letter names no price for the stock, nor time or terms of payment. It is admitted that this proposition, whatever it may mean, was not

accepted at the time. It contains no proposition as to how the stock was to be paid for; but Pinkney and his wife say in their evidence, as the bill alleges, that the price was to be $100.00 per share, payable out of the profits. Dixon denies this; and as we will find in his version of the agreement, and in perfect accord with his letter of June 30, 1918, that his first talk about stock was with Mrs. Pinkney early in the negotiations, when he said he would help Pinkney acquire some of the stock by paying for it as the other stockholders had done, and which, if he had at any time requested it, he could have obtained for him, but that plaintiff had not requested it. On the other hand, but not with reference to any agreement pleaded or relied on by him in the case, Dixon, supplementing the contract for $300.00 per month salary for Pinkney's services to the Price Hill company, had aided him in other ways, by allowing him the necessary time, two days or more per week, to do the mining engineering for the Richlands Coal Corporation, the Crab Orchard Coal & Land Company, and other outside engineering work, and by paying him bonuses amounting to $4,000.00, so that upon the whole his income, instead of being $300.00 per month, had amounted for the time employed to from $7,000.00 to $8,000.00 per year.

So that the contract admitted and proven by what the parties did under it is not the contract alleged in the bill. What was done under it is in perfect accord with the contention of the defendant Dixon.

Plaintiff's theory of partial performance is wholly unsupported by the proof. The facts established by plaintiff's evidence are that the certificate No. 31, for 58½ shares, was not delivered by Dixon to him in November, 1920, in part performance of the alleged sale of the 100 shares, but was first loaned to him in March 1919, to be used as collateral on a $2,500.00 note, to purchase a lot in Beckley, on which Pinkney built his home, and that this certificate, on payment of that note, was subsequently returned to Dixon by Pinkney with a memorandum attached, dated April 19, 1923, as follows: "Mr. Dixon, Note herewith 58½ shares of Stock Certificate No. 31." Signed, "H. H. Pinkney." When confronted

with this memorandum, Pinkney was inclined to doubt his handwriting, but said it looked like his writing and signature; and we think there can be doubt of it. The fact that he had, prior to November 1920, had this certificate of stock in his possession and so returned it, puts a crimp in his theory of delivery to him in November, 1920, as a partial performance of the alleged contract of sale and purchase thereof. The evidence leaves no room to doubt that the same certificate was later, about August 22, 1921, again put up by Dixon with the First National Bank of Mount Hope as collateral in a note of Pinkney's for $3,000.00, and from which bank Pinkney wrongfully obtained it and sought to appropriate it to his personal use. This appears from Dixon's correspondence with the bank.

The assistance thus accorded Pinkney by indorsement and the use of the collateral was seemingly supplemented by Dixon most liberally, by keeping and maintaining him and his family at his home in Virginia during a part of the time they were residing in Montana, and advancing him money out of the company's funds in the construction of his home at Beckley, and by gifts of money to aid them in furnishing their home, evidence of paternal love and affection rarely excelled, and seemingly rarely less appreciated by one's children.

Moreover, much evidence shows that Pinkney first threatened suit against the Price Hill Colliery Company, based on his claim that the alleged contract for the stock was with the company, but which he apparently abandoned, and by the present suit sought to put the obligation upon the defendant Dixon, and in which object we conclude, as the circuit court rightfully did, he has wholly failed.

In considering the case on this appeal it is vigorously argued by counsel for the appellant Pinkney, that we should not apply the rule generally accorded to the findings of fact by the trial court, because in this case the findings of the circuit court are not in accord with the issues presented by the pleadings and established by the evidence, wherefore not pertinent. The contention is that the contract on Dixon's part was not alleged or proven to be a part of the considera-

tion for the contract by the company to pay plaintiff his salary, house rent, etc., but the consideration going to Pinkney for resigning his Montana position and accepting employment by the defendant company rather than the better offers of other companies, as alleged. We think the proposed distinction between the two is rather fanciful than real, and unimportant. As previously shown, the allegations of the bill are that Dixon "as an inducement to plaintiff to accept said employment tendered him by the defendant company * * * offered to sell him 100 shares part of the capital stock then owned and held by said Dixon," etc. The letter of June 30th does not so propose. Besides, how could the alleged offer of Dixon to sell Pinkney his stock operate as an inducement to accept an offer by the colliery company be any less a part of the consideration for the contract with the company because made by Dixon, if so made? Moreover, Pinkney in a letter addressed to Dixon, dated April 27, 1921, says: "You will recall *as a part of the consideration for my services* and as an inducement to me, you were to transfer ten thousand dollars, or one hundred shares of original Price Hill Colliery Company stock to me, to be paid for out of the earnings of the company." It will be observed he does not say 100 shares of the stock owned and held by Dixon. Was not the inducement as much a part of the consideration for the contract as that which the parties specifically describe as the consideration therefor? The promise of stock and the promise of money together constituted the whole consideration, as well as the whole of the inducement. He was induced by both, and both he regarded as the consideration in its entirety. He so regarded them in his letter to Dixon, of April 27, 1921.

So that we see no ground for denying to the decree below the application of the general rule.

Assuming that there is substantial conflict in the evidence, on the material facts, there is no reason for applying the exception to the general rule respecting the findings of the lower court. This rule is firmly established here, as lastly announced in *Wood* v. *Johnson,* 102 W. Va. 484, 135 S. E. 606; and we respect this general rule though we might have rend-

ered a different decree had we acted in the first instance. *Crummett* v. *Crummett*, 102 W. Va. 151, 135 S. E. 16.

In our opinion there is very ample evidence in the cause, much of which we have referred to, but not all, which justified the conclusion and the decree of the lower court; and by a long line of decisions we should not disturb it on this appeal. *Wood* v. *Johnson, supra; Crummett* v. *Crummett, supra; Dickinson* v. *Rand,* 102 W. Va. 574, 136 S. E. 42; *McBee* v. *Deusenberry*, 99 W. Va. 176; *Ross* v. *McConnaughy*, 85 W. Va. 199; *Faulkner* v. *Grantham*, 55 W. Va. 317; *Weaver* v. *Akin*, 48 W. Va. 456; *Whiteman* v. *Backus*, 102 W. Va. 454, 135 S. E. 390.

The proposition relied on for reversal by counsel for plaintiff, that the findings of the circuit court are against the plain preponderance of the evidence, can not be sustained on the cases cited and relied on by them, namely, *Bank* v. *Depue*, 99 W. Va. 509, and *Rice* v. *Rice*, 88 W. Va. 54, syl. 2. Indeed we are of opinion that if the findings had been in favor of the contract as alleged, they would have to be reversed in favor of the defendant Dixon, because not established by a plain preponderance of the evidence.

This is a suit to enforce performance of an alleged parol contract for the sale and purchase of corporate stock, where the rule, as in cases of other property, is that the plaintiff will not be entertained in a court of equity unless the terms of agreement are certain and clearly established. *Patrick* v. *Horton*, 3 W. Va. 23; *Gallagher* v. *Gallagher*, 31 W. Va. 9; *Hissam* v. *Parish*, 41 W. Va. 686; *Barnes* v. *Cole*, 77 W. Va. 704; *Hermann* v. *Goddard*, 82 W. Va. 520.

Our conclusion is to affirm the decree.

*Affirmed.*