# Charleston.

## Tompkins' Ex'r *v.* Stephens *et al.*

(Absent, Moore, Judge.)

### Decided April 28, 1877.

1877.
January Term.

1. A decree of a circuit court granting or refusing a new trial on on an issue out of Chancery, may be reviewed in the Supreme Court of Appeals

2. Prior to the passage of the Code of West Virginia, on the trial of an issue out of Chancery, a defendant had a right to have his answer read, as evidence to the jury. And allegations of fact, positively stated in the answer, responsive to the bill, should have had, before the jury, the same effect as such answer then should have had, when read on the hearing in the chancery cause.

3. If, prior to the passage of the Code of West Virginia, such answer was not permitted to be read to the jury as such evidence, a new trial of the issue should have been awarded by the Chancellor, unless he was satisfied that if such answer had been read as such evidence, the verdict of the jury ought not, on that account to have been different.

4. If an issue out of Chancery was tried during the late war under circumstances occasioned by the war that rendered the trial unsatisfactory, the Chancellor ought to have set it aside; but though the trial was during the war and unsatisfactory in its character, yet if this unsatisfactory character of the trial was not occasioned by the war, but by the fact that one of the parties to the issue had, at the time of the trial, abandoned the case or become utterly indifferent to the result of the trial, the Chancellor, on his application made two years after the close of the war, ought not to have set aside such verdict.

The Hon. George Loomis, then a circuit judge, at the April term, 1867, of the circuit court of Mason county, rendered a decree by which he set aside the verdict of a jury, rendered at the April term, 1863, of said court, upon an issue directed to be tried at the bar of said court, in a cause then therein depending, wherein Rachel M. Tompkins, executrix of William Tompkins, was plaintiff, and William J. Stephens and others, were defendants.

An appeal was granted from said decree upon the petition of said executrix.

In the opinion of Green, President, may be found a sufficient statement of the cause.

*T. B. Swan,* for appellant, referred to the following authorities:

*Goods v. Lewis' adm'r,* 4 Leigh, 635; *Tanahan et al. v. Universal Insurance Co.,* 1 Peters, 183; 2 H. & M., 525; 2 T., 12, 113; 2 H. & M., 318; *Phasant v. Clamants,* 2 Leigh, 474. 5 Wend., 114; 10 Wend., 285; *Brough v. Shants,* 5 Leigh, 598; 2 T. C., 305; Code Va., p. 733, ch. 177, § 15; *Carter v. Campbell,* Gil. 270; *Apthup v. Comstock,* 2 Pap., 487; *Hutchinson et al. v. Kelly,* 1 Rob. R., 123; *Garland v. Reeves,* 4 Rand., 289.

*Smith & Knight,* for appellees, cited the following authorities:

2 Daniels' ch. Pr., 1286; *Poxell et ux v. Munson,* 22 Gratt., 117, 190; 2 Graham and Waterman on New Trials, 49; 2 Mad., ch. 481; *Slaco v. Maffat,* 2 Ves., 553; 2 Daniels' Chr. Pr., 1307; 3 Graham and Waterman on New Trials, 1553, 1554, 1578; Code Va., ch. 117, § 15; Code W. Va., 627, § 15.

GREEN, PRESIDENT:

William Tompkins, in 1855, instituted a suit in chancery in the circuit court of Mason county, to set aside as fraudulent a certain conveyance made by Abraham Wil-

1877.
January Term.

Tompkins' ex'r.
v.
Stephens *et al.*

liams and wife to his co-partner and brother-in-law, William J. Stephens, on August 10, 1852, and to subject his interest in the real and personal property thereby conveyed, to a judgment obtained by the plaintiff against him. The bill alleges that in 1850 Williams and Stephens formed a partnership for the manufacture of salt at West Columbia, in Mason county, and purchased a large amount of property, both real and personal; that one Friend, also claimed to be a partner, and was entitled to one third interest in this partnership. This was denied by Stephens and Williams; and that Friend instituted a chancery suit in Mason circuit to establish his interest; a copy of the record of this suit is filed with the bill; that said firm built a salt furnace on their property, bored salt wells, built out-houses, opened coal banks, and placed on said property all the necessary fixtures and erections for the manufacture of salt; that the said firm also had a store house on their said property, and during the years 1851, 1852, and up to August, 1853, were engaged in making salt and carrying on the business of merchandizing. The bill further alleges that Williams being much embarrassed and really insolvent, to defraud his creditors generally, and the plaintiff particularly, conveyed all his interest in said property, real and personal, to his brother-in-law and partner, William J. Stephens, for the pretended consideration of $9,866, on August 10, 1852; that Stephens was cognizant of this fraud and was aiding therein; that no part of this pretended consideration was ever paid; that Stephens was not in a condition to make this purchase, and had no means of paying the pretended consideration; that this pretended consideration was grossly inadequate, both parties regarding the interest of Williams then as worth much more; that Stephens, with the consent of Williams, in July and August, 1853, sold said property, real and personal, for $64,400; that of this purchase money Williams had collected $23,600, and had received an order to collect $10,250 more; that the

debts of the firm of Williams & Stephens were inconsiderable, as appears by an exhibit filed by Stephens in said chancery suit brought by Friend. And the plaintiff charges that a portion of the alleged debts in this exhibit are not justly due, specifying these debts.

To this bill Stephens & Williams filed separate answers. The answer of Stephens has been lost or taken from the papers of the suit, but at what time, in no manner appears, and it is now admitted that it can not be found or restored. The answer of Williams simply refers to and adopts this answer of Stephens, now lost, and denies in general terms all fraud, and says that the $9,866 was paid by the giving of negotiable notes, which he has transferred.

A large number of depositions were taken by both parties, and on the 23d day of April, 1858, " the court being of opinion that the main question in this cause is one proper for a trial by jury, it was adjudged, ordered and decreed that an issue be made up and tried by a jury at the bar of this court, to ascertain whether or not the deed of conveyance from Abraham Williams and Lucy E., his wife, to William J. Stephens, dated the 10th day of August, 1852, was made and executed on the part of said Abraham Williams for the purpose of delaying, hindering and defrauding his creditors, and whether said William J. Stephens, in receiving said conveyance, was cognizant of and participating in said fraudulent purpose of the said Abraham Williams, and upon the trial of this issue, the bill of the complainant and the answer of the defendants, William J. Stephens and Abraham Williams, may be read for the purpose of explaining the pretensions and claims of the respective parties ; and the depositions taken and filed in the cause may be read in evidence in the trial of the said issue, provided the witnesses are out of the commonwealth or unable to attend personally, from sickness or other infirmity.

In ordering the issue, the defendants, by their counsel, claimed that the answers of William J. Stephens and

1877.
January Term.

Tompkins' ex'r.
v.
Stephens et al.
A. Williams, when read before the jury, on the trial of such issue, should have the same effect as they would be entitled to in a court of equity, when read by the Chancellor, which the court declined to direct."

Accompanying this decree was an opinion of Judge Summers, which sufficiently shows the character of the evidence then before the court, and the nature of the controversy. The following is a copy of this opinion :

"Tompkins obtained judgment in the Mason circuit court at October term, 1854, against Abraham Williams, for $4,744.88 with interest and costs. Execution on the judgment returned no property found. He filed his bill at March rules, 1855, charging that Williams was partner with Stephens and Friend in the West Columbia salt property ; that he had made a pretended sale of his interest in the concern to Stephens ; that this was either intended to hinder and defraud his creditors ; that Stephens was privy to Williams' purpose and design, and that Williams had taken the same on time as before, showing the sale to have been a sham. He asks that Williams' interest be subjected to the judgment, or that if the sale be valid, a sufficient amount of the unpaid purchase money be appropriated to its payment. Williams and Stephens both deny fraud ; allege *bona fide* sale. They say that the purchase money has been paid by Stephens to Williams in negotiable paper, which was put into circulation and negotiated.

In Williams' answer to bill of Thomas R. Friend (made part of this cause), he says the sale was upon credit. The contract of sale, dated 19th July, 1852, exhibited with Stephens' answer), states the purchase money to have been $9,866, of which one thousand ($1,000) was payable 1st January, 1853; $3,000, 1st March, 1854 (with interest) ; the residue in five years, and to bear interest from January 1st, 1854. Stephens assumes all the debts so far as Williams is liable. Williams is to continue superintending the work until the 1st of November following, at $100 per month. The

deed from Williams and wife to Stephens is dated 10th August, 1852. It is acknowledged and admitted to record 4th September, 1852. There is some doubt upon the testimony whether Williams took much control over the furnace and salt operations after the close of the year 1852. In the spring of 1853, Williams was in Philadelphia purchasing goods. He and Stephens both went on. J. B. Smith says they left Cincinnati together in *March*, 1853. He afterwards met Stephens at Wheeling, on his way back, who informed him he left Williams completing his purchases in Philadelphia. Witness also met with him; that Williams told him he had bought about $7,000 ——, mostly with paper of Ruffner, Donally & Co.; that the goods were for West Columbia. The evidence shows that those goods were brought to West Columbia, where there was previously a store in name of Stephens. The new goods were opened and sold in name of McWilliams. The evidence shows that Abraham Williams took active charge of the store, and seemed to be principal manager now. In the case of Thomas R. Friend *v.* Stevens, &c. (referred to and made part of this case), the plaintiffs admit that these goods belonged to the concern; that the name was changed and business carried on in the style of Wm. Williams, to prevent the employer at furnace from getting in debt and running off, as had been the case when in name of Stephens, who could not control their accounts. This would look very much as if Williams continued his interest in the concern. If the sale was fraudulent and Williams really continued a partner, notwithstanding the sale, the plaintiff can only reach his interest in the concern after a settlement of its affairs, and the payment of all the partnership debts. The property was all sold by Stephens to W. C. Mining and Manufacturing Co., or to R. Robbins. Williams' share of the purchase money, after payment of debts, might be reached for his individual liabilities. The affairs of the concern have not yet been settled so as to know what will be the share of the part-

1877.
January

Tompkins' ex'r
v.;
Stephens *et al.*

ners, or whether there will be anything after the debts are all paid. If, on the other hand, the sale is valid and we are to regard Stephens as having bought out Williams for a specific sum, he, Stephens, assuming to pay all the liabilities of Williams as a partner, or, in other words, if Stephens was to pay Williams the $9,866, irrespective of the debts and liabilities of the concern, buying his interest at hazard for that sum, then the question would be whether the purchase money had been paid before this suit was instituted, or whether Stephens was the debtor of Williams, and in what sums. It is to be inferred from the answers that it was paid at the times in negotiable paper, which was used by Williams and placed beyond the control of the parties. But this is inconsistent with the contract exhibited by Stephens, which places all the payments on times, and extends the largest payment beyond the period of the commencement of this suit. It is also inconsistent with the answers of Williams in the suit brought by Friend. There is no proof on this point by either party. The question of fraud made by the complainant is a mixed one of law and fact. The bare fact of a man being in debt does not forbid his selling his property for a valuable consideration, and if the purchaser is without notice of the fraud where it exists, he will be protected from the creditor. There are several circumstances relied on by the plaintiff as showing the sale in this case to have been with intent to delay, hinder, and defraud creditors. The contracting parties were near relatives. The grantee was in straightened circumstances at the time of the pur-chase."

The issue ordered by Judge Summers was tried during the war, before the Judge of the then circuit court of Mason, and the jury found "that the deed of conveyance from Abraham Williams and Lucy, his wife, to William J. Stephens, dated the 10th day of August, 1852, was made and executed on the part of said Abraham Williams to William J. Stephens, for the purpose

of delaying, hindering and defrauding his creditors; <span style="float:right">1877. January Term.</span>
and they also find that said William J. Stephens was <span style="float:right">Tompkins' ex'r. v. Stephens et al.</span>
cognizant of, and participated in, said fraudulent purpose
of said Abraham Williams."

At the April term, 1867, the counsel for Stephens and others made a motion to set aside said verdict, upon numerous affidavits, and the complainant filed several counter affidavits. Upon consideration whereof, the then Judge of the court, Judge Loomis, decreed, "that there was not such a satisfactory trial of the issue that the court ought to act on the verdict rendered thereon. And the verdict on the said issue, rendered at the April term, 1863, was set aside and annulled."

On November 21, 1870, an appeal from this decree was allowed on the petition of Tompkins' ex'rx. The affidavits show that when this issue was tried in 1863, pending the war, that neither Williams nor Stephens was present, nor did they have any counsel present, though at the suggestion of plaintiff's counsel, two young and inexperienced lawyers, one of them a brother-in-law of Stephens, did appear for the defendants and try the case before the jury. They introduced no witnesses for the defendants, but read to the jury the depositions filed in the cause, and cross-examined the plaintiff's witnesses, and argued the case. At a former trial, in September, 1860, two witnesses who resided in Mason county, and one of them at the county seat, and perhaps others, had been examined for the defendants. The jury in this former trial had failed to agree. The trial of this issue was certainly very unsatisfactory; and if the affidavits had shewn that its unsatisfactory character had been occasioned by the pendency of the war, Judge Loomis would have been justified in setting the verdict aside. But the affidavits do not shew this; on the contrary, they shew that the unsatisfactory character of the trial was the result of utter indifference on the part of the defendant, as to what might be the result of the trial of this issue.

1877.
January Term,

Tompkins' ex'r
v.
Stephens et al.

Stephens, in his affidavit, states that a portion of the original purchase money of the property of Stephens and Williams was unpaid, and that since this trial all of the real estate of Stephens and Williams had been sold to satisfy the vendor's lien. The existence of this lien, and the purpose then of foreclosing it by a sale of the property in dispute, afterwards carried out, may have been the reason why Stephens and Williams were utterly indifferent, in 1863, as to what might be the result of the trial of the issue. But be this as it may, the affidavits filed by them, prove their utter indifference. The affidavits shew that the defendant, Stephens, who was a non-resident of the State, after the first trial, employed an agent, residing at Point Pleasant, the county seat of Mason, to pay attention to the preparation of the case for trial; that the counsel of the defendants, at the former trial, resided in Point Pleasant; that more than a year before the second trial, this counsel finding it was unsafe for him to remain at Point Pleasant, on account of his views of the war, had left there to reside in Virginia during the war; but this agent employed no other counsel for the defendants, and paid no attention to the case, not even knowing that the trial in 1863 was had, till the court adjourned, though he was, at the time of the trial, in the village of Point Pleasant when the trial took place, and where a brother-in-law of Stephens, a lawyer, lived. Such utter negligence of the case can only be reasonably accounted for by his knowledge that for some reason his principal had abandoned the case. It is true, he says, "that the hurry and bustle of the war and his personal misfortunes and physical sufferings *may have* caused him to forget the matter, and *perhaps* not attend to it as particularly as he might have otherwise done." But this is very far from swearing that in point of fact these things *did* prevent him from paying any kind of attention to the business he was employed to attend to; and this entire inattention to the case is the more striking, as this agent had been a wit-

ness for Stephens at the former trial, and had been examined for two hours.

Again, it appears that Stephens had been in personal attendance at the sessions of the circuit court of Mason county on several occasions after this trial and before the April term, 1867, when he first moved the court to set aside this verdict of the jury. Would he, under these circumstances, have permitted this verdict to stand for four years without asking it to be set aside, if he had not then been utterly indifferent whether it stood or not? It is true the defendants pretend to account for their giving no attention to the case because they say that some two or three years before the trial a proposition had been made to the plaintiff to take land in Tennessee for their debt. But this is a mere pretext; the proposition was not only not acceded to, but any consideration of it was promptly abandoned, and the plaintiff heard nothing more from the defendants upon the subject. It is true that Stephens, in his affidavit, does state that he went South about the time Memphis was taken, and he says that at the time of the trial he *believes*, and is almost certain, that he was in the military service of the United States, being embodied in the militia of the subjugated parts of the South ; and no able-bodied man was allowed to leave the military lines of the Union, in the locality where he was, without a pass, and passes were refused for some time to all, in consequence of continual fear of an attack from rebs." But he does not pretend to say that this was his reason for not attending tothe trial of this issue. This excuse his having been detained in the South seems, from this mode of stating it, rather to have been an afterthought; and he is not even sure that he was so detained. He does not even allege that he sought a pass, or that he was prevented from so doing by his knowledge that no pass would be given. This was thrown in to have whatever weight the law might give it, the real reason for his neglect in preparing for the trial being that he did not think it necessary to make any pre-

paration; but the affidavits show that neither the plaintiff or his counsel so acted as to furnish the defendant any just ground for failing to prepare for the trial, and the statements made by them on this subject are, on their face, highly improbable, if not absurd.

Stephens, in his affidavit, states that after the first trial, in 1860, in which the jury was hung, he was at a subsequent court fully ready for trial, but plaintiff's counsel begged him not to press the trial, "and an affidavit was made, it was believed that the plaintiff could not go to trial safely in the absence of one of his counsel; and it was believed by the affiant that this was the only ground urged for a continuance; it was believed by affiant that the Judge advised him to consent to the continuance, observing that it would be remembered, and that affiant should not be pressed to trial improperly or unprepared at a future time. Affiant met Major Parks, the plaintiff's counsel, who was absent when the cause was continued, shortly subsequently, who expressed much satisfaction at the continuance, and pledged himself solemnly to the affiants that he, Parks, would not at any subsequent term ask him, affiant, to try the cause unless he was fully prepared and ready for the trial; and this proposition, so kindly made, was accepted and fully relied on by the affiant, who, satisfied that no advantage would be taken of him, went into the kind of business he was contemplating doing." The statement of what occurred at the continuance of the case is not made positively, as it should have been, the affiant being present when the continuance was asked for; and if the affiant means to state that he believed that the Judge said that the defendants should not be pressed to trial if unprepared, without any reference to the use of due diligence on their part—in other words, without their consent—I feel assured that the affiant was either mistaken in what he says he *believes* the Judge stated, or that he misrepresents what was stated. No Judge would enter into such an arrangement with a party to a suit. And

if the court did continue the cause with the understanding that it should not in future be tried without the defendant's consent, this should be proved by an entry made on the record to that effect, and not be shown by the affidavit of an interested party, made before another Judge some six years afterwards. After the case had been continued, it is absurd to suppose that Major Parks, the plaintiffs' counsel, should voluntarily state to the plaintiff that he would never ask for the trial of the cause unless the defendants were fully prepared and ready for trial; it thereby is meant that the trial would never be urged, even though the defendants made no effort to prepare for trial; for such an understanding would, on his part, have been equivalent to a total abandonment of his client's case. I conclude, therefore, that this pretense on the part of the defendants is an afterthought, and was not the real reason why they made no preparation for trial. The probable reason, as I have shewn, is that for reasons they deemed then satisfactory to themselves, they had abandoned the case. I think, therefore, Judge Loomis erred in setting the verdict aside.

But it is insisted that the granting or refusing a new trial is entirely within the discretion of the court below, and that its action cannot be reviewed by an appellate court, and many authorities in different States are referred to as sustaining this proposition. Whatever may be the practice in other States, it is well settled in this State, that the Court of Appeals may review the action of a circuit court in either granting or refusing a new trial in a common law suit. See *Knox* v. *Garland*, 2 Call., 241, *Briscoe et al.* v. *Clarke*, 1 Rand., 213, and *Pleasants* v. *Clements*, 2 Leigh, 474. And I see no good reason why the same practice should not prevail in reference to the granting or refusing of new trials on issues out of chancery.

But another reason, not relied upon in the court below, is now insisted on as a sufficient ground to set aside the

verdict. By the order of Judge Summers, directing the trial of this issue, he directed the answers to be read for the purpose of explaining the pretensions of the defendants, but he declined to direct that they, when read, should have the same effect as when read by the Chancellor. Though when Judge Summers made this order there had been no express decision as to the effect which an answer in chancery read to a jury on the trial of an issue should have, yet there is no doubt that it ought, as the law then was, to have had the same effect when read to the jury as when read before the chancellor, and that Judge Summers ought to have given this direction when asked. See *Powell and wife* v. *Manson*, 22 Gratt., 177. The principles upon which a court of equity directs a new trial of an issue are somewhat different from those which govern courts of law in granting new trials. In *Barker* v. *Ray*, 2 Russell, 63, 3 Eng. Cond. Chy. R., 31, the Lord Chancellor says: "Issues are directed to satisfy the judge, which judge is supposed,. after he is in possession of all that transpired at the trial, to know all that passed here; and looking at the depositions in the cause, and the proceedings both here and at law, he is to see whether, on the whole, they do or do not satisfy him. It has been ruled over and over again, that if, on the trial of an issue, a judge reject evidence which ought to have been received, or receive evidence which ought to have been refused, though in that case a court of law would grant a new trial, yet if this Court is satisfied that, if the evidence improperly received had been rejected, or the evidence improperly rejected had been received, the verdict ought not to have been different, it will not grant a new trial merely upon such grounds." See, also, *Head* v. *Head*, 1 Sim. & St., 150; 1 Cond. Eng. Ch. R., 74, and *Apthorp* v. *Comstock*, 2 Paige, 487.

The answer of Stephens, in this case, has been either lost or taken out of the papers, and it does not appear whether it was lost before or since the trial in 1863. The answer of Williams refers to and adopts it, but

states no matter of fact in answer to the many specific

allegations of fact in the bill, excepting only he says, "he did receive for his interest in said property, negotiable paper to the amount of $9,866, which he has negotiated for value and put into circulation, as he had a right to do; and that he passed a part of said paper to James Williams, and the residue he has let go in various ways to various persons, whose names, if necessary, he can and will produce and make known to the court." I am satisfied to use the language of the Lord Chancellor above quoted: " If this evidence had been received on the trial " (and all the effect given to it, to which it was entitled in the chancery court), " the verdict ought not to have been different," and therefore that a new trial ought not to have been granted. Judge Summers read this answer and also the answer of Stephens, and gave them all the effect to which they were entitled in a chancery court, and he justly says in his opinion: " It is to be inferred from the answers that it (the purchase money) was paid at the time in negotiable paper, which was used by Williams and placed beyond the control of the parties. But this is inconsistent with the contract exhibited by Stephens, which places all payments on times, and extends the largest payment beyond the period of the commencement of this suit. It is also inconsistent with the answers of Williams in the suit brought by Friend; there is no proof on this point by either party." And we know there was no other proof on this point introduced by the defendants before the jury, as they allege in their affidavits that no parol evidence was introduced on their part on the trial of the issue.

The fact that Judge Loomis was not asked to set aside this verdict because the answers of these defendants had not been read as evidence before the jury, raises the presumption that they were so read by consent; or, if not so read, that they contained nothing which ought to have caused the jury to render a different verdict. And as Stephens' answer has been lost or taken out of the

papers, and it is admitted it cannot be supplied, I do not feel at liberty to infer that it was not read before the jury, and that if it had been read it ought to have produced a different verdict. Such inference, it seems to me, would be inconsistent with the defendants' conduct in failing to ask the setting aside of this verdict by Judge Loomis for this reason.

I am satisfied that justice would not now be promoted by a new trial. Nearly twenty-five years have elapsed since the transactions occurred which are the subject of enquiry; most of the witnesses, who are numerous, must be dead, and those living must now have but a faint recollection of the facts to which they would be called to testify. The depositions taken when these transactions were fresh, are more to be relied on now than even the parol testimony of witnesses given after this lapse of time; and a careful examination of these depositions satisfies me that upon this evidence the verdict of the jury was correct. The decree complained of must therefore be reversed, and the appellant must recover of the appellees, William J. Stephens, Abraham Williams and The West Columbia Mining and Manufacturing Company, their costs expended in this Court, and the verdict of the jury must be approved and confirmed and the cause remanded to the circuit court to be further proceeded with according to the principles laid down in this opinion and rules of equity and justice.

Judge Moore did not hear the cause, having been counsel in the court below.

DECREE REVERSED and cause remanded.