RICHARD L. FOUT *et al.* v. J. G. HANLIN *et al.*

(CC 477)

Submitted May 3, 1933.   Decided June 6, 1933.

D. E. Cuppett, and Chas. N. Finnell, for plaintiffs.

E. A. See, for defendants.

MAXWELL, PRESIDENT:

This suit is prosecuted under Code 1931, 42-1-9, to establish who are the heirs of Gabriel S. Kitzmiller, deceased, who died in May, 1932. It is averred by the petitioners, Richard L. Fout and Joseph W. Fout, that they are the sons of said decedent by a common law marriage between him and their mother, Hattie Fout. The defendants are collateral kindred of said decedent. The trial chancellor sustained their demurrer to the petition as amended, and certified his ruling to this Court for review.

Petitioners allege that in the year 1886, Hattie Fout, their mother, then about seventeen years of age, together with her parents, two brothers and a sister, moved into the home of said Kitzmiller on land owned by him in Mineral County, where Kitzmiller, then unmarried, had been living alone; that soon thereafter Kitzmiller and Hattie Fout "mutually agreed to then and there become man and wife and then and there assumed and carried out all the usual marital relationships and

lived openly as man and wife thereafter''; that for about the next seven years they lived together in the said home as husband and wife, together with her parents and her brothers and sister, and that within said period the petitioners were born, Richard in February, 1887, and Joseph in July, 1891; that at the request of Kitzmiller, Hattie Fout accompanied her parents and brothers and sister in moving from the Kitzmiller home to a house on an adjoining farm where certain work for Kitzmiller was carried on for about two years, and that she then returned with her father and his family to the Kitzmiller home from which they had removed; that all of them remained in the Kitzmiller home for the following three or four years and that during the whole time, including the period of about two years that she lived on an adjoining farm, she and Kitzmiller continued their marital relationship.

It is also alleged that in the year 1899, with the consent of her husband, Hattie Fout accompanied her father and his family when they moved from the Kitzmiller home to the town of Elk Garden in the said county whither they moved in order that her father and her brother might work at coal mining, and that she there kept house for her father and his family because her mother was ill and her sister was too young to assume the domestic burdens; that during the time she so lived at the home of her parents at Elk Garden, her ''said husband visited her frequently''; that in the year 1900 there was born to them a daughter which lived but a short time, and that Kitzmiller paid the expenses attendant upon the birth and burial of the child; that during the whole of the period when their mother resided with her father and his family at Elk Garden, she went each summer to Kitzmiller's home, at his request, with her two boys, the petitioners herein, and resided there during the summer months, during which periods the relationship of husband and wife was maintained between them; that in the year 1907, Hattie Fout and Kitzmiller mutually agreed to separate and to discontinue their marital relations, which agreement was largely due to the fact that Kitzmiller was about to take into his home an invalid, widowed sister; that Hattie Fout never took the name of Kitzmiller, nor gave that name to her two sons, the petitioners, because, as they are informed and believe, she was advised by her father

that she ought not to assume and take the name of Kitzmiller until she and her husband were regularly married by a preacher and that she, being young and ignorant of the law, thought her father knew best and complied with his wishes by continuing to retain her maiden name of Fout and by not calling their children by their father's name.

The petitioners further aver that after the date of the alleged common law marriage of Gabriel S. Kitzmiller and Hattie Fout, the fact of said marriage was a matter of general notoriety in the community in which they lived, and that the said parties held themselves out to the public as husband and wife and were generally recognized by their relatives, friends and the general public as being married to each other; that the petitioners as boys rendered service each year to their father, the said Kitzmiller, upon his farm until the separation of their father and mother, and that after the separation, at the request of Kitzmiller, they frequently assisted him in farm work for which they were not paid wages, but that he occasionally gave them some money with which to provide themselves with clothing; that Kitzmiller "recognized them as his children, taught them to call him 'daddy', and publicly recognize them as his sons whenever there was occasion to do so, and that petitioners always addressed him as 'daddy' as long as he lived"; that he recognized the fact that as his children they should have his property and authorized them, about the year 1921, to make sale of valuable portions thereof, in his lifetime, at such prices and upon such terms as they might determine, but that they were unable to consumate any such sale.

The legal theory of the petitioners is that although a common law marriage contracted in the State of West Virginia is not valid therein with respect to the principals to such relationship, the issue resulting therefrom is legitimate and may inherit from either parent. Reliance is had (1) upon the statute: "The issue of marriages deemed null in law, or dissolved by a court, shall nevertheless be legitimate." Code 1931, 42-1-7; and (2) upon the construction and application given that statute by this court in the case of *Kester* v. *Kester*, 106 W. Va. 615, 146 S. E. 625, wherein syllabus one reads: "A common-law marriage contracted in this state is not a valid marriage and is deemed null in law; nevertheless, the

children of such marriage are legitimate under section 7, chapter 78, Code, which provides that: 'The issue of marriages deemed null in law, or dissolved by a court, shall nevertheless be legitimate.' "

The defendants question the soundness of the principle of legitimization laid down in said syllabus and request our reconsideration thereof. It is urged that an attempted common law marriage in this jurisdiction is in reality "no marriage at all" and is not within the category "deemed null in law" specified in the statute above quoted. To emphasize this proposition, reference is made to Code 1931, 48-2-1, wherein there are set forth the various marital relationships which "shall be void from the time they are so declared by a decree of nullity." Common law marriages are not included in the enumeration.

We are of opinion, however, that in construing the legitimatizing statute first above quoted, it should not be limited in its application to null and void marriages enumerated by the statute last designated. The legitimating statute, founded in benevolence and charity, has for its design the protection of innocent offspring. Humanitarian principles require that the statute be liberally construed to effectuate its benign purpose. Many of the states of the American Union recognize the validity of common law marriages contracted within their borders. And, a state which does not permit common law marriages therein will give full recognition to such marriages when deemed legal in the state where contracted. *Miller* v. *Miller*, 76 W. Va. 352, 85 S. E. 542; *Jackson* v. *Comp. Comr.*, 106 W. Va. 374, 145 S. E. 753. In the light of this situation, we cannot hold, as insisted by defendants, that it was the legislative intent in this jurisdiction that a common law marriage attempted to be consummated in this state should be "no marriage at all". We think it is a marriage "deemed null at law" within the purview of the legitimatizing statute, *supra*.

In the case *In re Shipp's Estate*, (Cal.) 144 Pac. 143, there was involved a controversy growing out of a ceremonial marriage without a license as required by the statute. The facts are dissimilar to those at bar, but the court's opinion involves a discussion apropos here. The court stated:

"But granting, as has been said, the invalidity of the marriage, the respondent contends that the child is entitled to inherit as legitimate by virtue of the last clause of section 1387 of the Civil Code, providing that 'the issue of all marriages null· in law, or dissolved by divorce, are legitimate.' The appellant seeks to give. to this clause a very limited. interpretation; his contention being that the term 'marriages null in law,' as here used, includes only the marriages which are subject to an action for annulment on one of the grounds specified in section 82 of the Civil Code. We think the provision should not be construed so narrowly. The statute was passed with the generous and kindly purpose of relieving. children, to some extent, from the harsh consequences of illegitimacy—a status for which the children affected are in no degree morally responsible. The section should be liberally construed."

In the light of these considerations, we are persuaded that the principle recognized and applied in the case of *Kester* v. *Kester, supra,* must be adhered to as a correct pronouncement of the law.

We come now to consider whether the facts pleaded in the plaintiffs' petition and two amended and supplemental petitions disclose such relationship between Gabriel Kitzmiller and Hattie Fout as may be properly denominated a common law marriage.

A common law marriage is based on contract, formal or informal, between a man and woman capable in law of joining in such contract, to enter into the relationship of husband and wife at that time, consummated by their open and reciprocal assumption of marital obligations. 38 Corpus Juris, p. 1316; Schouler on Domestic Relations (6th Ed.), Vol. 2, sec. 1169-1174; Madden on Domestic Relations, p. 57.

Where there is a common law marriage it dates from the day of the contract between the parties. Their subsequent relationships are not part of the contract, but they constitute evidence tending to corroborate or destroy the contention that there was a marital contract. 18 Ruling Case Law, p. 394.

Petitioners allege a contract (presumably verbal because no writing is mentioned) between Gabriel Kitzmiller and Hattie Fout in the year 1886. Then, for the purpose of support-

ing said allegation, the petitioners make extended averments, hereinabove recited, of the subsequent relationship of Kitzmiller and Hattie Fout. These averments, in respect of the parties' openly conducting themselves as husband and wife, holding themselves out as such, and being thus generally recognized and considered by the people of the community where they lived, are broad and comprehensive, and if considered alone in their generalization would make a case. But, intertwined with these broad allegations are others which do not look well. It seems wholly inconsistent with the idea that Hattie Fout was the wife of Gabriel Kitzmiller that she should have moved about from place to place with her parents and her brothers and sister rather than remain in the home of her husband. That sort of thing is not consonant with usual and ordinary conduct in domestic relations.

Hattie Fout went into the Kitzmiller home with her parents and left it with them, first temporarily, and then permanently. She cleaved unto them rather than unto her alleged husband. And then, too, as emphasized by the trial chancellor, it is entirely out of harmony with ordinary propriety and the common acceptation of the fitness of things that a married woman, bearing children to her husband, would give them her maiden name and not the name of their father. The universal desire of married women that their children bear the surname of their father is not affected by the modernist's idea which sometimes prompts married women to retain their maiden names in order to avoid as far as possible the blending of their identity with that of their husbands. We think that these phases of the allegations of the petition as amended outweigh the generalization above discussed; they indicate a protracted liaison, an arrangement of convenience rather than a marriage.

The doctrine of common law marriage was probably further developed in this country than in England. This was an incident of American frontier life and sparse settlement. The meager facilities of transportation ofttimes presented serious difficulties in obtaining a marriage license and in securing the services of a minister or a magistrate. But the state fostered marriages and the rearing of children legitimately; so marriage was made easy. However, with the passing of pioneer conditions the reason for easy marriage no longer exists. With

population greatly increased, as in these modern days, the same considerations of public policy which favored unconstrained and unconventional marriage in prior generations now requires that the institution of marriage be circumscribed and safeguarded by a license of the state and a formal ceremony.

In discussion of these matters, the Supreme Court of Oregon very forcefully said:

> "The trend of modern authorities is against the recognition of common law marriages * * *. In our opinion the doctrine of common law marriages is contrary to public policy and public morals. It places a premium upon illicit cohabitation, and offers encouragement to the harlot and the adventuress. We do not sanction loose marriages or easy divorces. Good government demands that our laws be obeyed in the solemnization of marriages as in all things else. An adherence to the law in this regard will tend to cause the parties to look with respect and reverence upon a contract which is the most sacred known to man, and which ought not to be lightly cast aside." *Huard* v. *McTeigh*, (Ore.) 232 Pac. 658, 39 A. L. R. 528.

A relationship between a man and a woman, contracted in this state, coming within the characterization of common law marriage, can be recognized by the courts only for the purpose of legitimatizing children. Where, for such purpose, a common law marriage is pleaded, the proprieties and necessities presented by modern social life require that such relationship be proved by full and complete evidence. By the same tokens, the pleadings presenting such claim must be closely examined and rigidly appraised. Mere generalities of averment will not suffice. Where, as in this case, there are allegations of fact not reasonably consistent with marriage, the pleading setting forth such allegations must be held insufficient as a matter of law.

We are of opinion that the distinguished trial chancellor did not err in sustaining the defendants' demurrers to the petition and the first and second supplementary petitions.

*Affirmed.*