POLLY PICKENS *et al. v.* PRUDENCE MCCLELLAN O'HARA *et al.*

(No. 8598)

Submitted September 13, 1938.  Decided December 6, 1938.

752

*Linn Mapel Brannon, A. F. McCue, H. M. Garrett* and *Kingsley R. Smith,* for appellants.

*Herbert M. Blair, W. G. Stathers* and *Arch M. Cantrall,* for appellees.

RILEY, JUDGE:

Plaintiffs and Katie Keister, one of the defendants, appeal from a decree of the Circuit Court of Monongalia County denying the relief prayed for in the bill and in the answer of Katie Keister. This suit was instituted in the Circuit Court of Lewis County, and upon the disqualification of the judge of that court, was transferred to the Circuit Court of Monongalia County.

Polly Pickens, Harvey Radcliff Arnold, Annie Hitt, Ralph Radcliff Arnold, Warder Wilson Arnold and Austin James Radcliff Arnold, an infant, by Icie Radcliff Arnold, his next friend, brought this suit against Katie Keister, T. A. Whelan, special receiver, Grace Edmiston, an insane person, and Prudence McClellan O'Hara in her own right and as committee for Grace Edmiston, an insane person, and as administratrix *de bonis non* of the estate of William E. Arnold, deceased. The purposes of the suit are (1) to establish the right of the plaintiffs and Katie Keister to a share of certain funds in the hands of Whelan, special receiver, and to a share of other funds in the hands of Prudence McClellan O'Hara, administratrix, d.b.n.; (2) to permit Whelan to settle his accounts as special receiver; and (3) to require a settlement of the accounts of Prudence McClellan O'Hara as adminis-

tratrix, d.b.n. of the estate of William E. Arnold, deceased. The real object of the plaintiffs and Katie Keister in this litigation is to obtain a share of the estate of William E. Arnold, deceased, who was the father of Wilson A. Arnold. The will of William E. Arnold, after providing for his two daughters, and establishing a spendthrift trust for Wilson A. Arnold to be administered during the life of the latter, provided for disposition of the corpus of such trust in the following language:

"The principal whatever it· may be I will to any children my son Wilson may have surviving him. If he has none, then in that event, I will said principal to the children of my daughters Mary and Floride per capita."

The plaintiffs lay claim to the trust *res* as surviving children of Wilson A. Arnold, and the defendants, Grace Edmiston and Prudence McClellan O'Hara, as children of William E. Arnold's two daughters, Mary and Floride, respectively. Plaintiffs' claim, as shown by pleadings and brief, is confined solely to the theory of a common-law marriage.

The ultimate question, upon the answer to which the solution of this case depends, is: Was there a common-law marriage between Icie May Radcliff and Wilson A. Arnold, the parents of the plaintiffs and Katie Keister, so that the issue of such marriage will be legitimated by the provisions of Code, 42-1-7? This section of the Code, providing that, "The issue of marriages deemed null in law, or dissolved by a court, shall nevertheless be legitimate," legitimatizes the issue of common-law marriages. *Kester* v. *Kester*, 106 W. Va. 615, 146 S. E. 625; *Fout* v. *Hanlin*, 113 W. Va. 752, 169 S. E. 743; *Luther* v. *Luther*, 119 W. Va. 619, 195 S. E. 594.

On the hearing of this case, the circuit court ruled that the testimony of Icie May Radcliff as to personal transactions between her and Wilson A. Arnold, deceased, was inadmissible because Icie was a party to the suit as *prochein ami* for her son Austin, an infant at

the time suit was instituted (*Cooper* v. *Cooper*, 65 W. Va. 712, 64 S. E. 927), and for that reason, plaintiffs had failed to establish a "specific verbal contract" constituting a common-law marriage. We are at this point concerned only with the admissibility of her testimony and its possible effect on the decision of this case if it had been considered by the circuit court, and not with the nature of the agreement required to be established in order to show a common-law marriage. We shall first consider the competency of Icie to testify as to her agreement with Wilson, and then we shall consider the effect and weight of such testimony.

There can be no question that Icie testified to a specific contract of common-law marriage. According to Icie, the contract was made in 1893, about three weeks after the death of Wilson A. Arnold's first wife, and the circumstances of its making and its terms are detailed by her as follows:

> "Well, I got supper and we washed the dishes, and was nobody there but one man in the house, and he was there for supper, and we went in his (Wilson's) room and talked, and I sat down on his lap and we talked the matter over, and he said let's live as man and wife, and we set then and talked a while, and I agreed then to live as man and wife, and we set and talked, of course, and made love to one another, is what we did, and so we went to bed, and I was with him then from that on for forty-one years, lived as man and wife."

This relationship, so she testified, was to last "until death taken one or the tother of us."

In our opinion, this testimony was improperly rejected. Code, 57-3-1, with certain exceptions, removes from parties the common-law disability to testify. To render the testimony of a party incompetent, the questioned testimony must be against a person in one of the capacities specified in one of these exceptions. *Board of Education* v. *Harvey*, 70 W. Va. 480, 74 S. E. 507; *Shuman* v.

*Shuman*, 79 W. Va. 445, 91 S. E. 264. The fact that a witness bears a relationship to a decedent does not render incompetent his testimony of a personal transaction with the decedent unless against a person of a class named in the statute. *Savage* v. *Modern Woodmen of America*, 84 Kan. 63, 113 P. 802, 33 L. R. A. (N. S.) 773; *Wootters* v. *Hale*, 83 Tex. 563, 19 S. W. 134; *Clarke* v. *Ross* (Ia.), 60 N. W. 627; *Goodwin* v. *Fox*, 129 U. S. 601, 32 L. Ed. 805, 9 Sup. Ct. 367; *Douglass* v. *Snow*, 77 Me. 91; *Hodge* v. *Coriell*, 44 N. J. L. 456; *Partyka* v. *Zawadzki*, 131 Misc. 854, 228 N. Y. S. 494. This provision of the Code renders incompetent the testimony of a party to litigation in regard to a "personal transaction or communication" between such party and a person deceased, insane or lunatic at the time of examination if the testimony be against "the executor, administrator, heir at law, next of kin, assignee, legatee, devisee or survivor of such person, or the assignee or committee of such insane person or lunatic." None of the defendants in this case is sued in the capacity of any relationship to Wilson A. Arnold, but solely because of their relationship to William E. Arnold, and therefore, Icie is competent to testify as to her agreement, transactions and communications with Wilson.

This brings us to a consideration of the necessary effect of this testimony of Icie if it had been considered by the trial court. In doing so, we have kept in mind that, except in cases of original jurisdiction, the duties of this Court are appellate and not those of a trier of fact, and the findings of fact by the trial chancellor will not be disturbed on appeal unless at variance with undisputed evidence or contrary to the plain preponderance of the whole evidence. *Kincaid* v. *Evans*, 106 W. Va. 605, 146 S. E. 620; *McBee* v. *Deusenberry*, 99 W. Va. 176, 128 S. E. 378; *Baughman* v. *Hoffman*, 90 W. Va. 388, 110 S. E. 829; *Ross* v. *McConnaughy*, 85 W. Va. 199, 101 S. E. 443. But a decree against the plain preponderance of the evidence will be reversed. *Gall* v. *Cowell*, 118 W. Va. 263, 190 S. E. 130; *Smith* v. *Pew*, 116 W. Va. 734, 183 S. E. 53; *Wood* v. *Snodgrass*, 116 W. Va. 538,

182 S. E. 286. Ordinarily, the failure of the trial chancellor to consider competent testimony material to the issues requires a reversal and remand of the case for the consideration of such evidence. "This court will not, in the first instance, consider questions not yet acted upon by the trial court." *Highland* v. *Davis,* 119 W. Va. 501, 195 S. E. 604, 611. In the instant case, the trial chancellor had under appraisal the question of whether Wilson and Icie had entered into an agreement of marriage such as would bring the children born of their arrangement within the provisions of Code, 42-1-7, but he considered this question without regarding Icie's testimony. Usually, such a situation would call for remand. Where, however, on appeal this Court is clearly satisfied that if evidence, improperly rejected, had been admitted and considered and that a finding by the trial chancellor in favor of the parties offering such evidence would be contrary to the plain preponderance of the evidence, it will affirm the trial chancellor's finding despite the rejection of such evidence. This rule is too well established in our chancery practice and procedure to be disturbed at this time. *Tompkins' Ex'r.* v. *Stephens, et al.* (1877), 10 W. Va. 156, 168; *Nease, et al.* v. *Capehart, Ex'r.,* 15 W. Va. 299; *Watkins* v. *Wortman,* 19 W. Va. 78, pt. 6, Syllabus. In the *Nease* case this court held (Point 5, Syllabus) : "If on the trial of an issue (out of chancery) a court rejects evidence which ought to have been received, or receives evidence which ought to have been refused, though in that case a court of law would grant a new trial, yet if the Appellate Court is satisfied that, if the evidence improperly received had been rejected, or the evidence improperly rejected had been received, the verdict ought not to have been different, it will not grant a new trial merely upon such grounds." See also, *Head* v. *Head,* 1 Simmons & Stuart, 150, 57 Eng. Reports (Full Reprint) 61, 62; 5 Corpus Juris Secundum, subject Appeal and Error, section 1849, p. 1334. Conversely : "A decree appearing plainly right from the competent evidence in the case will not be reversed because of the admission of

incompetent evidence." *Ball* v. *Stewart,* 41 W. Va. 654, 24 S. E. 632; *Ball* v. *Kerns,* 41 W. Va. 657, 24 S. E. 633; *Talbott* v. *Woodford,* 48 W. Va. 449, 37 S. E. 580. A somewhat similar rule prevails in law actions. *Robinette* v. *Coal Mining Company,* 88 W. Va. 514, 107 S. E. 285, 25 A. L. R. 212; *Koch* v. *Wyllie China Company,* 80 W. Va. 331, 92 S. E. 656; *Wagoner* v. *Iaeger,* 49 W. Va. 61, 64, 38 S. E. 528; *Taylor* v. *B. & O. R. Co.,* pt. 3, Syllabus, 33 W. Va. 39, 10 S. E. 29; *Hall* v. *Lyons,* 29 W. Va. 410, 1 S. E. 582. In establishing this practice, this Court, to a large extent relied upon the practice then prevailing in the High Court of Chancery of England. In *Tompkins' Ex'r.* v. *Stephens, et al., supra,* and *Nease, et al.* v. *Capehart, Ex'r., supra,* the following language of Lord Chancellor Eldon in *Barker* v. *Ray,* 2 Russ 63, 38 Eng. Reports (Full Reprint), 259, was cited with approval: "It has been ruled over and over again, that, if, on the trial of an issue (out of chancery), a judge reject evidence which ought to have been received, or receive evidence which ought to have been refused, though in that case a court of law would grant a new trial, yet, if this Court is satisfied, that, if the evidence improperly received had been rejected, or the evidence improperly rejected had been received, the verdict ought not to have been different, it will not grant a new trial merely upon such grounds." With these principles in mind it becomes necessary for us to review the record to ascertain whether, if Icie's testimony had been considered, a finding by the trial chancellor in favor of the appellants would be contrary to the plain preponderance of the evidence.

The record is voluminous, intricate and detailed. In appreciation of counsels' excellent presentation, it is regrettable, perhaps, that we do not have the space to deal with the minute detail of the evidence, but, obviously, that is impossible and unnecessary. There are, however, certain salient parts of the evidence that so clearly and preponderantly refute Icie's testimony, and appellants' case in general, that the circuit court could not properly

have arrived at any conclusion other than the one it did. It is with these parts of the evidence that we deal.

"Where there is a common-law marriage it dates from the day of the contract between the parties. Their subsequent relationships are not part of the contract, but they constitute evidence tending to corroborate or destroy the contention that there was a marital contract." *Fout* v. *Hanlin, supra,* page 757.

Icie Radcliff fixed the time of her alleged marriage to Wilson Arnold as sometime in October, 1893. To prove this marriage, appellants offered Icie's direct testimony as to the agreement of marriage. To substantiate her testimony and for the purpose of establishing circumstances proving the marriage, they offered testimony of corroborating circumstances and actions on her part and on the part of Wilson. Testimony was introduced by appellants of matrimonial repute; of a holding out by Icie and Wilson that they were married; that Wilson introduced Icie as his wife and called her Mrs. Arnold and "Mom"; that Wilson recognized appellants as his children; that Wilson helped establish in housekeeping those of appellants who married within his lifetime and gave presents to the children of some of appellants; that Wilson and Icie lived together under the same roof, with only inconsequential interruption, for forty-one years and that during that time, Wilson bore the expenses of his household where he maintained Icie and appellants, and as well, paid the hospital and doctor bills for those of his household requiring such attention. We should be compelled to reverse the trial chancellor and to hold that a common-law marriage had been established if this were the only evidence before us. But there are circumstances that compel us to the conclusion that a finding by the trial court of a common-law marriage between Icie and Wilson would have been unjustified, though Icie's testimony had been considered.

The first of these circumstances is the relationship existing between Wilson and Icie's mother, Patience Ann Radcliff, prior to, at the time of, and subsequent to the

alleged marriage between Icie and Wilson. There can be no question that the relationship between Wilson and Patience was intimate, and that she bore a child by him on April 20, 1894. Thereafter, Patience bore him two more children on November 23, 1898, Icie in the meantime having borne him three children. Of these latter children by Patience, one died in infancy and the other testified in this case. The showing of this record is that Patience and Icie were on good terms during the life of the former and at times lived in the same house. The paternity of these children is not in doubt. It appears from a family record book in the possession of the appellant, Katie Keister, having a notation on the inside cover "Katie Keister, Weston, W. Va. January 20th, 1931. By W. A. Arnold" written entirely in Wilson Arnold's own handwriting. This record lists the birth of all of Wilson's children by Patience Ann and Icie, and, except a notation of Wilson's birth and death, it was written, according to Katie Keister, entirely by Wilson A. Arnold. From this book two of Patience Ann's children were born after three children were born to Icie. Such conduct on Wilson's part certainly does not indicate that he felt himself under any marital restraints. Though not of itself decisive of the case, it has important cumulative effect bearing on the question of good faith on the part of both Wilson and Icie.

The evidence of a marriage between Wilson and Icie is further weakened by a ceremonial marriage contracted between Wilson and Rhoda Garrett on March 21, 1896. There is hearsay testimony that Wilson was drunk at the time this marriage was contracted and continued drunk for two weeks thereafter, but this is contradicted by witnesses who saw him on the date of this marriage and who say he was sober. Beyond peradventure, Wilson and Rhoda spent the first night of their marriage together at the home of her father, and the next day Wilson took her to his home. When this happened, Icie left in anger and went to live with her mother, Patience. Wilson then followed the plan of maintaining Rhoda in his home but

spending the nights at the house occupied by Icie and Patience. Finally, on June 18, 1901, Rhoda secured an annulment of her marriage to Wilson, but the papers in that case have been lost and the decree fails to disclose on what grounds the annulment was obtained. Appellants make much of the fact that the decree was of annulment and not of divorce, contending that Wilson must have been incompetent to contract a valid marriage because of drunkenness, but we are unable to place much weight on this fact since an annulment under the law as it existed at that time (Warth's Code 1891, Chap. LXIV) could be obtained on charges other than those relating to mental competency to contract a marriage. Too, it is to be noted that Rhoda, not Wilson, obtained the decree. The important bearing in this case of Wilson's marriage to Rhoda is the showing thereby that Wilson regarded himself as capable of contracting a valid marriage. While it is true that in this state a common-law marriage for purposes other than that of legitimacy of the issue thereof is no marriage, we are of the opinion that the recognition or non-recognition of such alleged marriage as binding by the parties to it, especially when issue of the union is born after an act so palpably a refutation of such marriage as a subsequent ceremonial marriage between one of the parties and a third party, is strong evidence that the party did not regard his relationship with a claimed common-law spouse as anything other than meretricious from the beginning and that no contract of marriage was ever made. It is true that after this marriage with Rhoda had been annulled, Wilson told leading citizens of Lewis County, who had urged him to marry Icie ceremonially so that the very situation which has arisen might be avoided, that the children were his and that such marriage was unnecessary. Icie says Wilson made the same reply to persons urging him to go through a ceremonial marriage with her in 1913 when he was confined in a Clarksburg hospital suffering from a gunshot wound. This testimony seems more consonant with a misapprehension that the recognition of children by a father was sufficient, of

itself, to legitimatize, than with recognition of a marriage, even though one witness says that in the particular conversation with him, Wilson referred to Icie as Mrs. Arnold.

There are other actions by or with the knowledge of Wilson showing that he did not recognize a marriage between himself and Icie. Numerous legal papers, some of which described Wilson as single, and some of which described him as a widower, and others of which made no reference to marital status, were signed by him after his supposed marriage to Icie and she joined in none of them. By two of these papers Wilson Arnold conveyed in trust a tract of eleven acres, which he held in fee from his mother, Susan Arnold. In both no mention is made of his marital status. In 1910, Wilson filed a sworn answer in a chancery cause relating to the same property involved here which was pending in the Circuit Court of Lewis County, admitting the allegations of a bill having the material allegation that Wilson had "no children entitled to take under said will (William E. Arnold's) at his death, and is not married." At that time, five of appellants had been born.

A strong circumstance militating againsts appellants' contention of marriage is the extraordinary and constant use of the name Radcliff by Icie and her children. While it is true that the name of Icie and these appellants is Radcliff, it is not the accepted and usual conduct for a woman claiming to be married to retain her maiden name. There are, no doubt, members of the "Lucy Stone League", who, as married women, retain the use of their maiden name in order that their individualilty may not be submerged and lost in the name of their husbands, but there is no showing in this record that Icie was intending to follow any such policy. In 1914, Icie conducted extended litigation before a justice of the peace of Lewis County under the name of Icie Radcliff. From 1913 to the year 1933, inclusive, personal property owned by Icie was assessed on the assessor's books to her under the name Radcliff. In 1921, she became a member of

the Methodist Episcopal Church and was baptized by Reverend Thomas H. Taylor, a member of the West Virginia Conference of that church, under the name of Icy Radcliff. It is in the same name, according to the testimony of the president of the company which publishes the Weston Democrat, that she has received that paper since prior to October, 1920. As shown by the registration books, Icie was registered to vote under the name of Radcliff in the years 1926, 1928 and 1932, and in 1930 under the name "Ratcliff". This repeated use by Icie of the Radcliff name bears heavily on her own good faith and indicates strongly that she, too, regarded her relations with Wilson Arnold as falling short of marital. Then, again, it is most difficult to imagine any stronger evidence that she did not regard herself as legally married than her vain attempt in 1913, after having obtained a license, to induce Wilson to enter into a ceremonial marriage.

No less marked than the use of her maiden family name by Icie is the use of the same name by appellants. They were registered at school under the name Radcliff; they drew pay checks under that name; they were assessed for taxation in that name, and it was under that name that they voted. Of course, not every one of the appellants used the name Radcliff under all of these circumstances, but each used that name on one or more of the enumerated occasions. All of the appellants who were married prior to the institution of this suit obtained marriage licenses and were married under the Radcliff surname: Katie Keister, under the name of Miss Katherine Radcliff; Polly Pickens, under the name of Miss Grace Radcliff, the license listing her father and mother's names as Henry and Icie Radcliff, respectively; Annie Hitt, under the name of Miss Anna Radcliff; Harvey Radcliff, whose license listed John Radcliff and Icie (Jones) Radcliff as his parents, and Ralph Radcliff, whose license recites that it was issued upon his own oath. Icie explains this use of her maiden name by the children: "Well, I expect they went by the name of Radcliff most

of the time, they growed up and just didn't realize, you know, they thought we was not married or nothing, and just went by their own name, carried my name, most of them." She elaborated that they went by the name of Radcliff invariably, although Wilson taught them to call him "father." Such an explanation, coupled with this extensive and almost constant use of the Radcliff name by the children establishes a barrier of proof to the existence of a common-law marriage that is very difficult to scale. As Judge Maxwell well said in *Fout* v. *Hanlin, supra,* page 758, "it is entirely out of harmony with ordinary propriety and the common acceptation of the fitness of things that a married woman, bearing children to her husband, would give them her maiden name and not the name of their father."

Of course, the statute under consideration, because humanitarian in its purpose, must be liberally construed. *Stones* v. *Keeling* (1804), 5 Call (Va.) 143; *Luther* v. *Luther, supra.* This rule, however, does not dispense with the proof of a common-law marriage. In fact, the statute did receive a liberal construction when, under the holding in *Kester* v. *Kester, supra,* and the dictum in *Beverlin* v. *Beverlin,* 29 W. Va. 732, 3 S. E. 36, common-law marriages contracted in this state, though void as against the provisions of Code, 48-1, and the public policy underlying the same, were brought within the operation of the statute (Code, 42-1-7) for the purpose of legitimatizing the offspring thereof. Liberal construction of this statute, however, does not relieve the appellants from the burden of proving the facts of a common-law marriage. The construction of a statute and the necessity of proof thereunder are by no means one and the same thing. "No matter how liberal the construction, however," said Judge Hatcher in *Luther* v. *Luther, supra,* "there must be a relationship which under the law is matrimonial before the law could deem it null and the statute would operate." Of course, where a ceremonial marriage is claimed and both parties proceeded to and did live together as husband and wife un-

der the good faith impression that they were legally married and they are generally reputed to be married, the law will presume, in the absence of proof to the contrary, there had been in fact a ceremonial marriage. Such was the situation in the *Kester* case, at least as to the woman, and that is the only West Virginia case which legitimatizes children under the theory of common-law marriage. 1 Jones on Evidence, Civil Cases (4th Ed.), sections 86, 87; 1 Jones, Commentaries on Evidence (2d Ed.), sec. 51; *Travers* v. *Reinhardt*, 205 U. S. 423, 27 Sup. Ct. 563, 51 L. Ed. 865; Madden, Domestic Relations, 66, 67. It is equally well established that where a marriage has been lawfully solemnized or consummated, there is a strong presumption in favor of its validity and the burden of proof rests upon him who asserts its invalidity. Code, 48-2-2; *Perkey* v. *Perkey*, 87 W. Va. 656, 106 S. E. 40; 1 Jones on Evidence, Civil Cases (4th Ed.), p. 328; *Osmak* v. *American Car & Foundry Co.*, 328 Mo. 159, 40 S. W. (2d) 714, 77 A. L. R. 722, and note page 729; *Industrial Commission of Ohio* v. *Dell*, 104 Ohio St. 389, 135 N. E. 669, 34 A. L. R. 422, and note page 464; *Re Estate of Cox*, 95 Okla. 14, 217 P. 493, 34 A. L. R. 432, and note page 464. Here, however, there is no claim of a ceremonial marriage. In fact, such a marriage is denied by both appellants) and appellees. It follows, then, that appellants cannot prevail here unless they establish that they are children born of a relationship which would be legal as a common-law marriage were it not for the prerequisites of a valid marriage provided by Code, 48-1. The agreement of a man and woman, having lawful capacity to contract a marriage, to live together *cum copula* of itself will not constitute a "common-law marriage." Proof of the good faith of at least one of the parties is a necessary element. *Luther* v. *Luther, supra*; *Fout* v. *Hanlin, supra*. As Judge Hatcher, paraphrasing a syllabus point in *Bracken* v. *Bracken*, 45 S. D. 430, 188 N. W. 46, said in the *Luther* case: "To constitute a common-law marriage, there must be an understanding in the present tense that the parties are hus-

band and wife, and they must * * * *in good faith assume such relations* * * and believe in good faith* that they are husband and wife." (Italics supplied.) Common-law marriages being invalid in this state, this good faith element must be proved by strong and convincing testimony. A careful review of this record prompts us to the opinion that the good faith requirement is not met by the equivocal conduct of Wilson and Icie during the course of their relationship, as disclosed by this record. Here, no substantial claim was made that they usually, or to any great extent, held themselves out as married; and, in fact, almost invariably the people of the community knew they were unmarried. It will not do to say that appellants are innocent of the wrongdoing of their parents. Of course, they are innocent; but their guilt or innocence is not in question. This is not a criminal action. It is simply a suit in equity to test appellants' claim to a part of the estate of William E. Arnold. Their rights are entirely derivative from Wilson and Icie and must stand or fall upon the existence or non-existence of a common-law marriage, which, in turn, is wholly dependent upon their parents' conduct and good or bad faith.

We are of opinion that even if the trial chancellor had considered Icie's testimony, he could have properly arrived only at the result he reached, namely, that there was no common-law marriage between Icie and Wilson.

If our view on the question of the existence of a common-law marriage were otherwise, it would be necessary for us to address ourselves to appellees' suggestion that Code, 42-1-7, extends only to descent and distribution of intestate property. It is interesting to note, however, Judge Tucker's explanation in *Stones* v. *Keeling, supra:* "The act of 1785 (12 Hening's Statutes at Large, pp. 139, 140, the original statute, identical with our present statute) * * * relates to the disposition of property only; and proceeds to shew who shall be admitted to share the property *of a person dying intestate,* * * *." (Italics supplied.)

The decree of the Circuit Court of Monongalia County is therefore affirmed.

*Affirmed.*

HATCHER, JUDGE, dissenting:

The association between Wilson Arnold and Icie Radcliff started under a contract initiating a common-law marriage. This association continued for forty-one years. Irrespective of Wilson's lapse of good faith in ceremonially marrying another woman, Icie kept unbroken faith for that entire period. In my opinion, under benevolent construction, her faith and association with Wilson subsequent to annulment of the ceremonial marriage reconstructed the common-law marriage relationship. Consequently, its issue should be deemed legitimate.

Judge Kenna concurs in the foregoing dissent.

KENNA, JUDGE, dissenting:

It seems to me that there is an essential incongruity between the construction heretofore placed by this Court upon one statutory provision and the plain language of another, which necessarily throws the evidence in cases of this nature into so much confusion that the unavoidable outcome in contested causes should be to abide by the decision of the fact-finding tribunal. I refer to Code, 42-1-7, providing that the issue of marriages deemed null shall yet be legitimate, which this Court has held should be liberally construed and to be applicable to the issue of a common-law marriage (*Kester* v. *Kester*, 106 W. Va. 615, 146 S. E. 625; *Fout* v. *Hanlin*, 113 W. Va. 752, 169 S. E. 743), and Code, 61-8-4, prescribing a fine of fifty dollars and, subject to the court's discretion, six months imprisonment, and for a repetition of the offense, not less than six nor more than twelve months imprisonment. This Court has construed the first section as including common-law marriages among those deemed null, the offspring of which is to be deemed legitimate, and also has held that those living together as man and wife with-

out a ceremonial marriage were unlawfully cohabitating.

It seems perfectly plain that, based on this construction, Code, 42-1-7, was enacted solely for the benefit of the issue, and its liberal construction should be with the end in mind of accomplishing that purpose. I do not see how the principals can be charged with the duty of consistent conduct under this Court's construction of Code, 42-1-7, and the plain meaning of Code, 61-8-4.

The trial judge, in his written opinion, stressed the fact that the plaintiff's failure to establish a specific verbal contract of marriage was due to the inadmissibility of Icie's testimony. This Court has held it admissible. It was the only testimony directly probative of this question. The remainder of the proof showed circumstances which inferentially either refuted or corroborated Icie's statements as to the specific contract of marriage. As I have already said, the inconsistency of the inferences to be drawn from the circumstances shown seems to me to be fully accounted for by the fact that under the law in West Virginia persons guilty of the offense of unlawful cohabitation may nevertheless produce legitimate issue. To my mind, this fact prevents Icie's testimony from being plainly unbelievable, and the painstaking length of the majority opinion demonstrates the detailed consideration of the evidence involved in reaching the opposite conclusion.

The intervening ceremonial marriage of Arnold was nullified by the decree of a court of competent jurisdiction. To my mind, that marriage was not, under the circumstances, a determinative factor any more than was Arnold's relationship with Icie's mother. I think that Arnold's moral character, Icie's youth and inexperience at the time she stated the specific contract of marriage was entered into, combined with the inconsistency of the prescribed rules of conduct, constitute a typical instance in which the case should be remanded for the further consideration of a fact-finding tribunal.